927 A.2d 1250

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MICHELLE L. ELDERS, DEFENDANT–
APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RONALD STANLEY, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. TASHA JONES, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER M. LEACH, DEFENDANT–
APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANTHONY GRAHAM, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARCELLIUS M. LOVE, DEFENDANT–
APPELLANT.

Argued February 13, 2007—Decided July 30, 2007.

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for appellants (*Yvonne Smith Segars,* Public Defender, attorney).

*Marcia L. Silva,* Assistant Prosecutor, argued the cause for respondent (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney; *Ms. Silva* and *Simon Louis Rosenbach,* Assistant Prosecutor, of counsel and on the briefs).

*Leslie Stolbof Simenus* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Ms. Simenus,* attorney; *Steven G. Sanders,* of counsel and on the brief).

*Frank Muroski,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Stuart Rabner,* Attorney General, attorney).

Justice ALBIN delivered the opinion of the Court.

In *State v. Carty,* 170 *N.J.* 632, 635, 790 *A.2d* 903, *modified on other grounds,* 174 *N.J.* 351, 806 *A.2d* 798 (2002), we held that a police officer may not ask for consent to search a lawfully stopped vehicle or its occupants unless the officer has "a reasonable and articulable suspicion" that the occupants are engaged in criminal wrongdoing. A consent search of a validly stopped car without the requisite suspicion will result in exclusion of the evidence at trial. *Id.* at 647–48, 790 *A.2d* 903. In this appeal, we must decide whether the principles of *Carty* extend to the occupants of a car *disabled* on the shoulder of a highway.

Here, both the trial court and Appellate Division agreed that *Carty* applies to a disabled vehicle on a roadway, but came to different conclusions concerning the constitutionality of the consent search in this case. The trial court determined, among other things, that the state troopers, who requested consent to search a car broken down on the side of the New Jersey Turnpike, did not have reasonable and articulable suspicion to believe that the occupants were engaged in criminal wrongdoing and suppressed drugs and drug-related evidence seized from the car and its occupants. The Appellate Division reversed, maintaining that it owed no deference to the trial court's factual determinations, which were based in part on a videotape of the events on the highway, and found that the officers had the necessary level of suspicion to seek a consent search.

We now hold that the reasonable and articulable suspicion standard governing consent searches of cars validly stopped equal-

ly applies to disabled cars on our roadways. In this case, in reversing the trial court's holding that defendants were subjected to an unconstitutional search, the Appellate Division did not apply the correct standard of review for a suppression hearing. The appellate panel should have determined only whether there was sufficient credible evidence to support the trial court's findings and should not have reviewed the evidence de novo or acted as a factfinder in the first instance. Because the trial court's findings are supported by sufficient credible evidence in the record, we are compelled to reinstate the order suppressing the evidence.

## I.

### A.

Defendants Michelle L. Elders, Ronald D. Stanley, Tasha Jones, Christopher M. Leach, Anthony Graham, and Marcellius M. Love were charged in a Middlesex County indictment with first-degree conspiracy, *N.J.S.A.* 2C:5–2 (count one); first-degree possession with intent to distribute a controlled dangerous substance (CDS), *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(1) (count two); third-degree possession of a CDS, *N.J.S.A.* 2C:35–10a(1) (count three); and fourth-degree possession with intent to distribute a CDS, *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(12) (count four). The charges arose from events that occurred on the New Jersey Turnpike. After a stay in New York City, defendants apparently were returning home to North Carolina in a Lincoln Town Car and a Honda Accord when the Lincoln's gas tank came loose, sending both cars to the shoulder of the Turnpike. This set the scene for their encounter with New Jersey State Police troopers, who discovered a sizeable quantity of drugs and a large amount of cash after conducting a "consent" search of the Lincoln and a later search of defendants.

Defendants contested the constitutionality of the search and sought to suppress this evidence. At a motion to suppress hearing, the record consisted solely of the testimony of two New

Jersey State Troopers—Trooper Sean O'Connor and Sergeant Ronald Klem—and a videotape of the encounter recorded by a camera mounted on their marked troop car.[1]

In the early morning hours of September 17, 2004, Trooper O'Connor and Sergeant Klem were patrolling the New Jersey Turnpike in the area of Edison Township when they noticed on the shoulder of the road the disabled Lincoln Town Car. At the time, they were pursuing a speeding car and did not stop. A short while later, at approximately 2:50 a.m., the troopers observed that the Lincoln was still on the Turnpike's shoulder. The troopers then turned on their troop car's overhead light, which automatically activated both the car's video camera and audio equipment[2] and pulled directly behind the Lincoln.[3] Twenty-five feet in front of the Lincoln was a Honda Accord.

At the scene, defendants Graham and Love were underneath the Lincoln attempting to reattach the gas tank, defendants Elders and Jones were sitting on the guardrail, and defendants Leach and Stanley were sleeping in the Honda. As the troop car parked, Love came from under the Lincoln and signaled to the troopers that everything was "okay." When the troopers approached the disabled Lincoln, Graham and Love told them that the car's gas tank had fallen off the car. That explanation did not assuage Sergeant Klem, who thought "[s]omething wasn't right" and, at some point, surmised that perhaps drugs were being secreted in a compartment beneath the car. To Trooper O'Con-

---

[1] Our review of the videotape has assisted us in describing the sequence of events.

[2] Trooper O'Connor carried in his pocket a transmitter box, which "act[ed] as a microphone for the [video] camera."

[3] As the troopers pulled over to the shoulder, they informed the dispatcher that two black men were underneath the disabled car. Moreover, they informed the dispatcher that the disabled car had a North Carolina license plate and provided the dispatcher with the plate number.

nor, Graham and Love appeared "nervous" and not desirous of help. Neither trooper called for roadside assistance.

Sergeant Klem then walked towards the Honda, where Leach and Stanley were asleep, while Trooper O'Connor engaged Elders away from her companions. In response to Trooper O'Connor's questions concerning her whereabouts, Elders responded that she was returning to North Carolina after having visited her sister in Brooklyn for two days. She told the trooper that both vehicles belonged to Leach. Trooper O'Connor then instructed her to return to the guardrail for her safety. A registration check of the cars revealed that Leach did not own the vehicles and that neither had been reported stolen.

The two troopers again approached Graham and Love, who were working underneath the Lincoln. Trooper O'Connor then got under the car, claiming to lend assistance. Graham and Love asked for a ratchet; the trooper had none to give and did not offer to call a service station. Trooper O'Connor then ordered the two men to get up from underneath the vehicle and to go to the guardrail for their safety. The trooper did so to maintain control of the scene and to facilitate his questioning of them. Indeed, he wanted to keep "tabs on everybody."

Trooper O'Connor next took Graham aside and questioned him. Graham told the trooper that he had been visiting his family in Manhattan. Graham further stated that defendants were all "cousins," but he knew them only by their street names. With that information, Trooper O'Connor conferred with Sergeant Klem, pointing out that Elders and Graham claimed to have visited two different New York City locations.

Trooper O'Connor then made his way to the Honda, where both Leach and Stanley were still asleep, and knocked on the driver's side window. The two troopers were "beginning to develop a reasonable suspicion there was some criminal activity going on," and so Trooper O'Connor directed Leach and Stanley to exit the vehicle for the troopers' safety. The troopers wanted "not only to question them but to get more control over the scene."

Leach told Trooper O'Connor that "he'd been in New York in the Bronx for a couple days where he had been buying clothes." Trooper O'Connor examined Leach about ownership of the Lincoln, and when he sensed that Leach was not cooperating, yelled, "You will answer any questions." After continued interrogation, Leach indicated that he was in charge of both cars. At that point, approximately 3:06 a.m., as revealed by the videotape, Leach told Trooper O'Connor that he wanted an attorney.[4] During their exchange, the trooper told Leach not to give him "attitude." Trooper O'Connor admitted at the hearing that at that time defendants were no longer free to leave the scene because he "felt [he] had a reasonable and articulable suspicion some type of criminal activity was going on," and he intended to continue his investigation. When one of the defendants moved off the guardrail, Trooper O'Connor "put them in their place" in order to "take control of the situation." At approximately 3:08 a.m., two back-up troopers arrived at the scene and kept an eye on defendants.

Based on the conflicting statements and the nervousness of some of the defendants, the absence of the registered owner, and the suspicion aroused by the gas tank falling off the car, Sergeant Klem gave Trooper O'Connor permission to request a consent search of the Lincoln. Trooper O'Connor then asked Leach whether he would consent to a search of the car. Leach initially stated that he would, but after being placed in the passenger's seat of the patrol car, he balked at giving written authorization. With Sergeant Klem positioned in the driver's seat and Trooper O'Connor kneeling outside the passenger's seat, Leach was quickly read his rights from the consent search form, including his right to refuse consent. While Trooper O'Connor was reading the consent form, Leach shook his head left and right, indicating no. When Trooper O'Connor asked him to sign the form, Leach said, "You can search my car but I don't sign." Trooper O'Connor

---

[4] At the hearing, Trooper O'Connor claimed that he did not hear Leach's request for an attorney due to the heavy traffic on the Turnpike, although he conceded that the request could be clearly heard on the videotape.

responded, "That's fine. You don't have to sign. We'll just call for a dog." Leach was told that he would be detained until the dog arrived.[5]

At about 3:36 a.m., after being told again that his consent had to be voluntary, Leach signed the consent form.[6] Trooper O'Connor thoroughly searched the Lincoln. Underneath the hood, in the engine compartment, he found black electrical tape wrapped around a "bundle" that later was identified as concealing one-half of a kilogram of cocaine and over fifty grams of marijuana. Based on the suspected contents of the bundle at the time, all six defendants were arrested and searched. On Elders, the troopers discovered a "small white chunky substance" that they believed to be crack cocaine. They also uncovered $8,000 in cash on Stanley and $3,000 in cash on Leach.

Based on the troopers' testimony and the videotape, the Honorable Frederick P. DeVesa, J.S.C., the motion judge, concluded that the drugs and money seized by the troopers were the product of an unconstitutional, warrantless search and therefore suppressed the evidence.

## B.

First, Judge DeVesa found that *Carty* applied to the encounter on the shoulder of the Turnpike, where the troopers stopped at first to assist the disabled vehicle. Accordingly, the troopers were not constitutionally authorized to request a consent search unless they had reasonable and articulable suspicion that defendants were engaged in wrongdoing. Judge DeVesa determined that shortly after the troopers arrived on the scene the encounter with

---

[5] At the hearing, Trooper O'Connor testified that it might have taken as long as an hour for the on-duty canine officer and the dog to arrive. Both Trooper O'Connor and Sergeant Klem insisted that they had reasonable and articulable suspicion that some form of criminal activity was afoot and therefore a drug-sniffing dog was the next logical step.

[6] The videotape indicates that the consent form was signed at 3:28 a.m.

defendants "was converted into an investigative detention." He reasoned that defendants, who were directed to sit on the guardrail by the troopers and questioned separately on the shoulder of the Turnpike, a limited access highway, were not free to leave.

Ultimately, Judge DeVesa maintained that the troopers did not possess the requisite suspicion to conduct an investigative detention or request a consent search. He found no authority to support the supposition that "mere nervousness and conflicting statements give rise to reasonable suspicion." He then focused on to the key word, articulable. He could not find an "*articulable* suspicion that there were drugs secreted in the [Lincoln] based upon [the] type of information" available to the troopers. (Emphasis added). Moreover, he could not accept the argument that a reasonable suspicion arises that "people are hiding drugs in the motor vehicle" whenever there is a "loose part on a motor vehicle," such as the hanging gas tank in this case. Thus, the troopers' belief that drugs were concealed in the Lincoln was "nothing more than a hunch," which under *Carty* is an insufficient basis for requesting a consent search.

In addition, Judge DeVesa determined that the State did not meet its burden of showing that Leach *knowingly and voluntarily* consented to the search. He noted that Leach was detained for a substantial period of time and not free to leave; that Leach had asked for a lawyer (a request that was either ignored or not heard by the troopers); that he was surrounded by troopers when asked to sign the consent form; and that when he refused to sign the form, Trooper O'Connor threatened to detain him even longer until a dog was called to the scene. He concluded that the State did not sustain its burden of proving that, under the totality of circumstances, Leach had freely given his consent to the search.

Because the investigatory detention and consent search were not premised on reasonable and articulable suspicion and because defendant Leach did not knowingly and voluntarily consent to the search, the recovery of the drugs from the Lincoln was an unconstitutional seizure. The validity of the search of the individ-

ual defendants depended on the legality of the search of the car, therefore, Judge DeVesa suppressed all evidence seized at the scene. The State appealed.

## C.

The Appellate Division reversed the motion judge's grant of the motion to suppress.[7] *State v. Elders,* 386 *N.J.Super.* 208, 233, 899 *A.*2d 1037 (App.Div.2006). The panel agreed with Judge DeVesa that the principle holding of *Carty*—that a reasonable and articulable suspicion is a prerequisite to a request for a consent search—applies to a police encounter with occupants of a disabled car stranded on the shoulder of a highway. *Id.* at 214, 221–22, 899 *A.*2d 1037. The panel saw no reason to restrict *Carty* to protect only occupants of a car stopped by the police and not occupants of a car "stopped for other reasons" who are importuned by the police to consent to a search of the vehicle. *Id.* at 222, 899 *A.*2d 1037. The panel reasoned that "[t]he potential for unwarranted police intrusion upon private citizens traveling our highways—the evil that *Carty* sought to address—exists in either situation." *Ibid.*

Unlike the trial court, however, the Appellate Division was persuaded that the troopers had the requisite suspicion to conduct an investigative detention and request a consent search and that Leach knowingly and voluntarily gave his consent to the search of the Lincoln. *Id.* at 222–28, 230, 899 *A.*2d 1037. Although the panel recognized that ordinarily it is bound to uphold the motion judge's findings if "they are supported by sufficient credible evidence in the record," it concluded that in this case it owed "no special deference to judicial factfinding[s]" because the "most

---

[7] It should be noted that before the Appellate Division, the State "filed separate Notices of Appeal respecting each defendant." *State v. Elders,* 386 *N.J.Super.* 208, 213 n. 1, 899 *A.*2d 1037 (App.Div.2006). The State's briefs were identical, as were each of the defendant's briefs. *Ibid.* Given that the issues raised were the same, the Appellate Division consolidated the six appeals in its opinion. *Ibid.*

telling evidence" was the videotape and because there were no material factual disputes arising from the evidence. *Id.* at 228, 899 *A.*2d 1037.

The panel homed in on the factors that it believed gave rise to an objectively reasonable suspicion of criminal wrongdoing that justified both the investigative detention and the consent search request: the nervous behavior of some of the defendants; the reference by Graham to defendants as "cousins" although he knew the others only by their street names; the different accounts given of their whereabouts in New York City; and the Lincoln's loose gas tank that made an impression on Sergeant Klem. *Id.* at 225–28, 899 *A.*2d 1037. Based on its own factfindings, the panel concluded that the troopers conducted a proper investigative detention and had "reasonable, articulable suspicion that there was evidence of crime in the vehicle they sought to search." *Id.* at 228, 899 *A.*2d 1037.

The panel also determined that Leach was not coerced into giving his consent to search the car. In that regard, the panel noted that based on the standard of reasonable suspicion, the troopers were legally entitled to call for the use of a drug-sniffing dog and, therefore, their advising Leach that they would do so unless he signed the consent-to-search form "was a fair prediction of events that would follow, not a deceptive threat made to deprive [him] of the ability to make an informed consent." *Id.* at 229–30, 899 *A.*2d 1037 (citation and internal quotation marks omitted) (alteration in original). The panel also rejected the arguments that Leach's request for an attorney in the opening minutes of his encounter with the troopers and that Trooper O'Connor's earlier angry remark vitiated the voluntariness of Leach's later consent to search. *See id.* at 230, 233, 899 *A.*2d 1037. Accordingly, the Appellate Division held that Leach's consent to search the vehicle was voluntarily given and that the seizure of the evidence met the appropriate constitutional standards. *Id.* at 232–33, 899 *A.*2d 1037.

We granted defendants' motion for leave to appeal the Appellate Division's ruling. We also granted the motions of the Association

of Criminal Defense Attorneys of New Jersey and the Attorney General to participate as *amici curiae*.

## II.

In challenging the Appellate Division's reversal of the motion judge's suppression of the evidence, defendants raise essentially three issues. They claim that the troopers, almost from the inception of their arrival, were not involved in a community caretaking operation to assist stranded motorists but rather conducted an unconstitutional investigatory detention unsupported by reasonable and articulable suspicion. They further claim that the troopers did not have reasonable and articulable suspicion to request a consent search under *Carty*. Last, they contend that as a result of the coercive atmosphere and conduct of the troopers, defendant Leach did not knowingly and voluntarily consent to the search of the Lincoln Town Car. On the basis of those arguments, individually and collectively, defendants seek reinstatement of the suppression order. Underlying those arguments is defendants' assertion that the Appellate Division exceeded its authority by substituting its own factual findings for those of the motion judge.

On the other hand, the State contends that the Appellate Division erred by extending the protections of *Carty* to the occupants of a car not stopped but disabled on the side of the road. The State argues that *Carty* should be confined to its narrow circumstances—police stops—and not to cases involving officers who go to render assistance to stranded vehicles on the shoulder of a roadway. Assuming that *Carty* is applicable, the State basically presents the same facts and reasons relied on by the Appellate Division to uphold the search of the car and defendants. The State argues that the troopers had reasonable and articulable suspicion to detain defendants and to request a consent search and that Leach freely gave his consent to search the Lincoln.

We first turn to the issue of first impression before us—whether *Carty's* protections apply not only to the occupants of motor vehicle stops but also to those whose cars have been disabled on a roadway.

### III.

In *Carty, supra,* we "grapple[d] with the problems caused by standardless requests for consent searches of motor vehicles lawfully stopped for minor traffic offenses." 170 *N.J.* at 640, 790 *A.*2d 903. We addressed those problems, not in a vacuum, but in the context of "the widespread abuse of our existing law" by law enforcement officers who obtained consent searches for routine motor vehicle stops. *Id.* at 646, 790 *A.*2d 903. We understood that an individual who "is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle" might feel compelled to consent. *Id.* at 644, 790 *A.*2d 903. We also recognized that not having an "objective standard or rule to govern the exercise of discretion, would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Id.* at 641, 790 *A.*2d 903 (citation and internal quotation marks omitted).

Even before Carty, New Jersey, along with a small minority of jurisdictions, was at the nation's forefront, subjecting consent searches to "a higher level of scrutiny" than available under the Federal Constitution. *Id.* at 639, 790 *A.*2d 903; *State v. Domicz,* 188 *N.J.* 285, 307, 907 *A.*2d 395 (2006). In *State v. Johnson,* 68 *N.J.* 349, 354, 346 *A.*2d 66 (1975), we held that Article I, Paragraph 7 of the New Jersey Constitution, which protects people within this State from "unreasonable searches," [8] requires the State to prove, as a prerequisite to a lawful consent search, that a

---

[8] Article I, Paragraph 7, which is almost identical in wording to the Fourth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

person have knowledge of his right to refuse to give consent. *See also Domicz, supra,* 188 *N.J.* at 307, 907 *A.*2d 395.

■ Nevertheless, we later determined that the heightened procedural protections that generally apply to consent searches were inadequate in dealing with the "indiscriminate abuse of consent searches of cars whose operators had been stopped for minor traffic infractions." *Id.* at 305–06, 907 *A.*2d 395. Accordingly, in *Carty, supra,* we held that law enforcement officers are required to have a reasonable and articulable suspicion of criminal activity before requesting consent to search a car stopped for a motor vehicle infraction. 170 *N.J.* at 635, 790 *A.*2d 903. We imposed the reasonable suspicion standard for "the prophylactic purpose of preventing the police from turning routine traffic stops into a fishing expedition for criminal activity unrelated to the lawful stop." *Ibid.* We based our decision on Article I, Paragraph 7 of our State Constitution. *Id.* at 635, 647, 654, 790 *A.*2d 903.

The State urges us to limit *Carty* to its narrow facts and to distinguish between a police stop for a motor vehicle violation and police assistance to a disabled vehicle as part of a community caretaking duty. The State argues that the focus of *Carty's* concern was on the prolonged detention of the driver stopped for a minor motor vehicle violation who is subjected to a police officer "capriciously" wanting to search his car. In the State's view, the stranded driver of a disabled car is not quite as vulnerable in a police encounter as the driver of a car stopped for a motor vehicle violation.

We will not parse *Carty* as finely as the State would have us do. The underlying constitutional concerns that animated our decision in *Carty* apply as well to occupants of disabled cars stranded on the side of a roadway. Clearly, in the case of a disabled vehicle, if the police are fulfilling a community caretaking function, the consent search of a car for evidence of criminality is hardly in keeping with that mission. The driver of a disabled car facing police officers whose offer of assistance quickly turns into a "fishing expedition" based on a "hunch" that criminal activity is

afoot is subject to no less compulsion to accede to a consent search than the driver subject to a typical motor vehicle stop. The driver of a disabled car is, for the most part, in the same inherently coercive predicament as the driver stopped on the highway— consent to the search and prolong the period of detention or refuse consent and perhaps suffer ramifications.

A police officer investigating rather than rendering assistance to a disabled car's occupants, and intent on searching the car, may be less likely to expedite roadside help. Thus, that driver who is importuned to give his consent to search is as isolated and perhaps as vulnerable as the driver hailed to the side of the road for a routine motor vehicle stop. The protections provided in *Carty* would appear to be of no less importance to motorists stranded on the shoulder of a roadway than those subjected to an automobile stop.

■ We are in agreement with both the trial court and the Appellate Division that the underlying rationale and salutary purpose of *Carty* extends to cars disabled on the side of a road. Therefore, the drivers and occupants of disabled cars are entitled to the same level of protection afforded to the drivers and occupants of cars involved in a motor vehicle stop. In both cases, a police officer who wishes to conduct a consent search must have reasonable and articulable suspicion to believe that evidence of criminal wrongdoing will be found in the vehicle before seeking consent for the search.

Here, the motion judge and Appellate Division applied the *Carty* standard to the vehicular consent search. The Appellate Division, however, did not defer to the motion judge's factfindings. Therefore, the question now before us is whether the Appellate Division improperly substituted its own factfindings for those of the motion judge.

## IV.

The motion judge concluded that the troopers did not have reasonable and articulable suspicion either to conduct an investiga-

tory detention of defendants or to request defendant Leach's consent to search the Lincoln Town Car. On both grounds, the motion judge suppressed the evidence seized from the car and later from the individual defendants.

Based on its own review of the record, the Appellate Division reversed the motion judge, finding that the troopers possessed a reasonable and articulable suspicion for an investigative detention and a consent search. Although the panel acknowledged that it must defer to findings of facts supported by sufficient credible evidence, it declared that "[n]o material factual dispute or contradiction arose from [the] evidence, and [therefore] no special deference to judicial factfinding [was] warranted." *Elders, supra,* 386 *N.J.Super.* at 228, 899 *A.*2d 1037. The panel considered the videotape to be "[t]he most telling evidence at the hearing" and reasoned that "the observations upon which the motion judge explicitly made his findings and drew his conclusions came from the videotaped encounter, and that videotape is equally available to us." *Id.* at 228, 232, 899 *A.*2d 1037. Relying on its own observations of the videotape and drawing its own conclusions from the "essentially undisputed" testimony of the two troopers, the panel was "satisfied that the troopers had a reasonable, articulable suspicion that there was evidence of crime in the vehicle they sought to search." *Id.* at 228, 899 *A.*2d 1037.

A.

Our analysis must begin with an understanding of the standard of appellate review that applies to a motion judge's findings in a suppression hearing. As the Appellate Division in this case clearly recognized, an appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are "supported by sufficient credible evidence in the record." *Ibid.* (citing *State v. Locurto,* 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999)); *see also State v. Slockbower,* 79 *N.J.* 1, 13, 397 *A.*2d 1050 (1979) (concluding that "there was substantial credible evidence to support the findings of

the motion judge that the ... investigatory search [was] not based on probable cause"); *State v. Alvarez*, 238 *N.J.Super.* 560, 562–64, 570 *A.*2d 459 (App.Div.1990) (stating that standard of review on appeal from motion to suppress is whether "the findings made by the judge could reasonably have been reached on sufficient credible evidence present in the record" (citing *State v. Johnson*, 42 *N.J.* 146, 164, 199 *A.*2d 809 (1964))).

An appellate court "should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." *Johnson, supra,* 42 *N.J.* at 161, 199 *A.*2d 809. An appellate court should not disturb the trial court's findings merely because "it might have reached a different conclusion were it the trial tribunal" or because "the trial court decided all evidence or inference conflicts in favor of one side" in a close case. *Id.* at 162, 199 *A.*2d 809. A trial court's findings should be disturbed only if they are so clearly mistaken "that the interests of justice demand intervention and correction." *Ibid.* In those circumstances solely should an appellate court "appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." *Ibid.*

We cannot agree with the Appellate Division that the availability of a videotape of the troopers' encounter with defendants, particularly in the context of a hearing where witnesses testified, extinguishes the deference owed to a trial court's findings. *See, e.g., United States v. Santos,* 403 *F.*3d 1120, 1128 (10th Cir.2005) (noting "increasing availability of videotapes of traffic stops due to cameras mounted on patrol cars does not deprive district courts of their expertise as finders of fact, or alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts"); *United States v. Welerford,* 356 *F.*3d 932, 935–36 (8th Cir.2004) (recognizing that an appellate court must defer to district court's findings denying defendant's motion to suppress even when videotape of defendant's encounter with State Trooper is available); *United States v. Navarro–*

*Camacho,* 186 *F*.3d 701, 706–07 (6th Cir.1999) (noting that in case involving videotape of vehicle stop, circuit court reviews district court's findings of fact for "clear error," given that "magistrate judge was able not only to view the videotape, but also to hear from an array of witnesses who testified about either (1) the videotape itself or (2) the events depicted on it"). In *State v. Chapman,* 332 *N.J.Super.* 452, 459–60, 753 *A.*2d 1179 (App.Div. 2000), the Appellate Division properly followed the deferential standard set forth in *Johnson* in a vehicular consent search case involving a videotape. In concluding that the voluntariness of the consent was supported by substantial, credible evidence on the record, the panel noted that the trial court had the benefit not only of viewing the videotape, but also of observing the testimony of witnesses. *Id.* at 459–60, 467, 753 *A.*2d 1179.

■ The Appellate Division in this case did not apply the deferential standard of review to the motion judge's findings. Those factual findings were based on both the troopers' testimony and the videotape. The video camera for the most part was in a fixed position and therefore could not record all of the events, and the audio to the tape could not clearly capture all of the conversations because of the heavy Turnpike traffic. The motion judge was entitled to draw inferences from the evidence and make factual findings based on his "feel of the case," and those findings were entitled to deference unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice required appellate intervention. *See, e.g., N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007). A disagreement with how the motion judge weighed the evidence in a close case is not a sufficient basis for an appellate court to substitute its own factual findings to decide the matter.

We therefore conclude that the Appellate Division did not apply the proper deferential standard of review to the motion judge's factual findings. We now must determine whether those findings are supported by sufficient credible evidence in the record.

B.

Before we decide whether Judge DeVesa was "clearly mistaken" in concluding that the troopers conducted an unconstitutional investigative detention and consent search, we must survey the principles of law that are applicable to the facts of this case. We start by noting that under both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of our State Constitution, searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid. *State v. Pineiro,* 181 *N.J.* 13, 19, 853 *A.*2d 887 (2004). Because our constitutional jurisprudence evinces a strong preference for judicially issued warrants, the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure "falls within one of the few well-delineated exceptions to the warrant requirement." *Id.* at 19–20, 853 *A.*2d 887 (citations and internal quotation marks omitted); *see also State v. Wilson,* 178 *N.J.* 7, 12–13, 833 *A.*2d 1087 (2003). The two exceptions to the warrant requirement at play in this case are the investigative detention and the consent search.

Not all interactions between law enforcement and citizens constitute seizures, and not all seizures are unconstitutional. *State v. Maryland,* 167 *N.J.* 471, 483, 486–87, 771 *A.*2d 1220 (2001). For example, a police officer who approaches an individual in a public place for the purpose of questioning him has not "seized" the person in the constitutional sense so long as the person has not been denied the right to walk away. *State v. Rodriguez,* 172 *N.J.* 117, 126, 796 *A.*2d 857 (2002). Such "field inquiries" are permitted even if they are not based on a well-grounded suspicion of criminal activity. *Ibid.* However, encounters with the police in which a person's freedom of movement is restricted, such as an arrest or an investigatory stop or detention, must satisfy acceptable constitutional standards. See *State v. Nishina,* 175 *N.J.* 502, 510–11, 816 *A.*2d 153 (2003); *Rodriguez, supra,* 172 *N.J.* at 126–27, 796 *A.*2d 857. Here, we are dealing with an investigatory stop, which is a citizen encounter with the

police that results in a relatively brief detention restricting a person's right to walk away. *Maryland, supra,* 167 *N.J.* at 486–87, 771 *A.*2d 1220.

An investigatory stop or detention is constitutional only "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." *Rodriguez, supra,* 172 *N.J.* at 126, 796 *A.*2d 857 (quoting *Terry v. Ohio,* 392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968)). An investigative detention that is premised on less than reasonable and articulable suspicion is an "unlawful seizure," and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule. *Id.* at 132–33, 796 *A.*2d 857 (concluding that investigative detention without requisite level of suspicion nullifies defendant's subsequent consent to search, and therefore evidence seized as result of search must be suppressed). To determine whether the State has shown a valid investigative detention requires a consideration of the totality of the circumstances. We have recognized that

> [n]o mathematical formula exists for deciding whether the totality of the circumstances provided the officer with articulable or particularized suspicion that the individual in question was involved in criminal activity. Such a determination can be made only through a sensitive appraisal of the circumstances in each case. In each case, the reasons for such particularized suspicion will be given careful scrutiny by the Court. A seizure cannot—we emphasize cannot—be justified merely by a police officer's subjective hunch.
>
> [*Pineiro, supra,* 181 *N.J.* at 27, 853 *A.*2d 887 (quoting *State v. Davis,* 104 *N.J.* 490, 505, 517 *A.*2d 859 (1986)).]

The reasonable and articulable standard for investigatory detentions set forth here applies as well to consent searches of automobiles under *Carty.* With those legal principles in mind, we next examine the motion judge's factual findings to see whether they are supported by sufficient credible evidence in the record.

C.

The motion judge maintained that the state troopers' encounter with defendants on the shoulder of the Turnpike quickly

escalated from community caretaking—responding to a disabled vehicle to provide assistance—to an investigative detention.[9] The trial court stated:

> While it may be true that these defendants were already stopped on the Turnpike when the State Police confronted them, it is also clear from the testimony of both officers that *almost immediately after making these observations and stopping the police vehicles the nature of the encounter was converted into an investigative detention.* The officers began to question the defendants about who they were and where they were coming from, separated them, asked them to sit on the guardrail while this questioning was taking place and most importantly it hasn't been mentioned here with any great degree of specificity but we're dealing here with a limited access highway. People are not free to walk away. People confronted by the police on the New Jersey Turnpike they're pretty much restricted in their movement by virtue of the nature of the highway itself.
>
> [ (Emphasis added).]

Those findings are amply supported by the record. The motion judge considered that the troopers never called for roadside assistance even though from the moment of their arrival they became aware of a serious mechanical problem with the Lincoln. After about two minutes on the scene, Trooper O'Connor pulled defendant Elders to the side, away from the other defendants, and began questioning her about her whereabouts. The trooper did not inquire into the disabled car's condition or suggest that she leave in the functioning Honda for safety reasons. Arguably, the encounter turned into a detention before the troopers heard any seemingly inconsistent accounts of the locations defendants had been visiting in New York.

Within six minutes of the stop, Trooper O'Connor forcefully ordered, not asked, defendants Graham and Love to get up from

---

[9] The community caretaker doctrine reflects the realization that police officers are often called on not to investigate crimes, but instead " 'to ensure the safety and welfare of the citizenry at large.' " *State v. Diloreto,* 180 *N.J.* 264, 276, 850 *A.*2d 1226 (2004) (quoting John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions,* 89 *J.Crim. L. & Criminology* 433, 445 (1999)). Police officers serve as community caretakers when their actions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 715 (1973).

underneath the Lincoln Town Car and to stand by the guardrail. Once up, Graham was questioned, not about the car's condition, but about the places he had visited during his trip to New York. Shortly afterwards, defendants Leach and Stanley also were told to stand by the guardrail. When Trooper O'Connor sensed that Leach was not cooperating with him, he yelled, "You will answer any questions." Leach's request for an attorney was followed by Trooper O'Connor stating that he had a bad attitude.

The motion judge addressed all of the evidence that the State argued supported a finding of reasonable and articulable suspicion: defendants' nervous behavior, their conflicting statements, and the fallen-off gas tank. In the motion judge's view, there were "many reasons" that could explain the "nervousness" of some of the defendants and the "conflicting statements" at 3 a.m. on the shoulder of the Turnpike. Indeed, it is a sad fact that not all persons feel comfortable in the presence of the police. *State v. Tucker*, 136 *N.J.* 158, 169, 642 *A.*2d 401 (1994) (recognizing "[t]hat some city residents may not feel entirely comfortable in the presence of some, if not all, police is regrettable but true"); *State v. Kuhn*, 213 *N.J.Super.* 275, 282, 517 *A.*2d 162 (App.Div.1986) ("[N]ot wish[ing] to be in the proximity of police, [is] not a commendable, but also not an unlawful attitude."); *see also Carty*, 170 *N.J.* at 648, 790 *A.*2d 903 ("[A]ppearance of nervousness is not sufficient grounds for the reasonable and articulable suspicion necessary to extend the scope of a detention beyond the reason for the original stop.").

With regard to defendants' different accounts of where they were visiting in New York City (one said Brooklyn, another Manhattan, and yet another the Bronx), it was anything but clear that six defendants visiting over two days in two separate cars did not go their own ways, and even if they did not, that out-of-towners from North Carolina would have had a familiarity with the five boroughs. See *State ex rel. J.G.*, 320 *N.J.Super.* 21, 33, 726 *A.*2d 948 (App.Div.1999) (finding that conflicting answers to whereabouts—first "Brooklyn," then the "Village"—did not, along

with other nominal factors, amount to reasonable and articulable suspicion of drug activity). To be sure, nervousness and conflicting statements, along with indicia of wrongdoing, can be cumulative factors in a totality of the circumstances analysis that leads to a finding of reasonable and articulable suspicion of ongoing criminality. *See State v. Stovall,* 170 *N.J.* 346, 367, 788 *A.*2d 746 (2002) (noting that even though nervousness may be normal, it does not detract from fact that "a suspect's nervousness plays a role in determining whether reasonable suspicion exists").

According to the motion judge, the State fell short in showing that there was an "articulable" suspicion. From his viewpoint, the information available to the troopers gave rise to nothing more than a "hunch" that "something was wrong." With respect to Sergeant Klem's testimony that the hanging gas tank caused him to be suspicious, Judge DeVesa rejected the notion that "any time there's a loose part on a motor vehicle that somehow that should give rise to believe that people are hiding drugs in the motor vehicle." He apparently acknowledged that although an officer's experience and knowledge must be afforded due weight to " 'specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his [or her] experience,' " generalizations could not form the basis for reasonable and articulable suspicion. *See id.* at 361, 788 *A.*2d 746 (quoting *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909) (alterations in original).

The motion judge could not conclude that in the circumstances of this case, "simple nervousness" and "conflicting statements" gave "rise to a reasonable suspicion that drugs [were] being secreted in this vehicle." In the end, he held that the troopers did not possess the requisite suspicion either to conduct the investigatory stop or request consent to search the Lincoln.

The motion judge's findings concerning the timing of the investigatory detention and whether the troopers possessed the necessary suspicion were close calls. We cannot conclude, however, based on our review of the record, that those findings are so clearly mistaken that an appellate court should substitute its own

judgment. Accordingly, we are compelled to reverse the Appellate Division and reinstate the motion judge's order suppressing the evidence.

Because the unconstitutional investigatory detention and request for consent to search standing alone support suppression of the evidence, we need not reach the question of whether defendant Leach's consent was knowingly and voluntarily given to the troopers.

## V.

In summary, we hold that under our State Constitution, law enforcement officers cannot request consent to search a disabled vehicle on the shoulder of a roadway unless they have reasonable and articulable suspicion to believe that evidence of criminal wrongdoing will be discovered in the vehicle. Under our deferential standard of appellate review, we conclude that there was sufficient credible evidence in the record to support the motion judge's findings that the troopers engaged in an unconstitutional investigatory detention and search of the Lincoln Town Car and individual defendants. We, therefore, affirm in part and reverse in part, reinstate the motion judge's suppression order, and remand to the trial court for proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

I respectfully dissent from the majority's determination of this cause substantially for the reasons persuasively explained by Judge Wecker in State v. Elders, 386 N.J.Super. 208, 899 A.2d 1037 (App.Div.2006). I add only the following.

The majority takes issue with what it characterizes as the Appellate Division's failure to "apply the correct standard of review for a suppression hearing." Ante, 192 N.J. at 231, 927 A.2d at 1254 (2007). According to the majority, the panel engaged in "its own factfindings," ante, at 238, 927 A.2d at 1258, "did not defer to the motion judge's factfindings," ante, at 242, 927 A.2d at

1261, and thus "improperly substituted its own factfindings for those of the motion judge[,]" *ibid.* In the end, the majority concludes that "[t]he Appellate Division in this case did not apply the deferential standard of review to the motion judge's findings." *Ante,* at 245, 927 A.2d at 1262. For the reasons that follow, I disagree.

Instead of parsing out the panel's words on the subject, it is more instructive to read, as an integrated whole, how the panel viewed its task in this appeal:

> When the outcome of a suppression hearing is dependent upon the judge's findings of fact, including witness credibility, we defer to those findings as long as they are supported by sufficient credible evidence in the record. See *State v. Locurto,* 157 *N.J.* 463, 474, 724 A.2d 234 (1999). Here, however, the outcome is based upon the judge's application of the law to facts that are essentially undisputed. The most telling evidence at the hearing was the videotape of the highway incident, and the only witnesses at the hearing were the two troopers most closely involved in the incident. No material factual dispute or contradiction arose from that evidence, and no special deference to judicial factfinding is warranted. We are satisfied that the troopers had a reasonable, articulable suspicion that there was evidence of crime in the vehicle they sought to search.
>
> [*Elders, supra,* 386 *N.J.Super.* at 228, 899 A.2d 1037.]

There is nothing in the Appellate Division's decision that supports the conclusion that it willy-nilly jettisoned the motion judge's *factual* findings in favor of its own. Indeed, the panel explains—and no one contests—that there were no material factual disputes here. Thus, all that remained was the application of law to those undisputed facts. And, in that context, we have repeatedly and uniformly held that "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 A.2d 1230 (1995). *See Raspa v. Office of the Sheriff,* 191 *N.J.* 323, 334–35, 924 A.2d 435 (2007) (same, quoting *Manalapan Realty, supra* ); *State v. Drury,* 190 *N.J.* 197, 209, 919 A.2d 813 (2007) ("We therefore owe no deference to the interpretation of the trial court or the appellate panel, and apply instead a de novo standard of review" (citation omitted)); *State v. Harris,* 181 *N.J.* 391, 419, 859 A.2d 364 (2004) (same, quoting *Manalapan Realty, supra* ); *Pheasant Bridge Corp. v. Twp. of Warren,* 169 *N.J.* 282, 293, 777

A.2d 334 (2001) (same, citing *Manalapan Realty, supra* ); *In re Return of Weapons to J.W.D.,* 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997) ("If, however, an appellate court is reviewing a trial court's legal conclusions, the same level of deference is not required" (citing *Manalapan Realty, supra* )). Applying the law to the facts, the panel concluded, in respect of the actual search of the car, that "the troopers had a reasonable, articulable suspicion that there was evidence of crime in the vehicle they sought to search." *Elders, supra,* 386 *N.J.Super.* at 228, 899 *A.*2d 1037. That is a conclusion of law derived from the application of law to a given set of facts. It is only that legal conclusion that is at odds with the motion judge's legal conclusion; there is no substantive difference between factual findings relied on by the motion judge and those the panel referenced in support of its conclusion.

The Appellate Division did reject the motion judge's factual findings in a limited respect: "whether [defendant Christopher] Leach's apparent request for an attorney earlier in the confrontation was a sufficient basis for the judge to conclude that Leach's subsequent consent was not voluntary." *Id.* at 230, 899 *A.*2d 1037. The panel recited at length the factual findings made by the motion judge concerning that matter, and it "recognize[d its] obligation to give deference to the [factual] findings of the Law Division judge, as long as those findings are based upon sufficient credible evidence in the record." *Id.* at 231, 899 *A.*2d 1037 (citing *Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234). The Appellate Division explained, however, that "the rationale for according the trial judge's finding such deference is that those findings 'are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record.' " *Id.* at 232, 724 *A.*2d 234 (quoting *State v. Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234).

The panel explained that, because "the observations upon which the motion judge explicitly made his findings and drew his conclusions came from the videotaped encounter, and [because] that videotape is equally available to us[,]" it readily was able to gauge

whether those findings were supported by sufficient credible evidence in the record. *Ibid.* It determined that they were not. As the Appellate Division noted, its "own observations [of the videotape] do not support the findings cited by the judge to conclude that Leach did not voluntarily consent to the search." *Ibid.* The panel then listed five separate reasons for rejecting the motion judge's findings in respect of Leach's consent to the search of his car. *Id.* at 232–33, 724 *A.*2d 234. Having given due deference to the motion judge, the Appellate Division nonetheless concluded that his findings were not supported by sufficient credible evidence in the record. It was for that reason—and not from the application of an incorrect standard of review—that the panel reversed the motion judge's ruling.

Because the majority reverses the judgment of the Appellate Division based on its view that the panel applied an incorrect standard of review, because I disagree with that conclusion, and because I would affirm the panel's legal conclusion that both the search and Leach's consent to search were proper, I respectfully dissent.

*For affirmance in part/reversal in part/remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For affirmance*—Justice RIVERA–SOTO—1.