**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0729-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

HARVEY CUTTS, a/k/a,
HARVEY L. CUTTS, and
HARVEY L. CUTTS, JR.,

    Defendant-Appellant.

_____

Argued October 29, 2024 – Decided December 11, 2024

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 23-02-0326.

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Kevin J. Hein, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Kevin J. Hein, of counsel and on the brief).

PER CURIAM

A police officer stopped, detained, and frisked defendant Harvey Cutts while he was standing with a group of men on a street in Camden. Following the denial of his motion to suppress the evidence, including a handgun, seized from him during a pat down of his person and then a search incident to his arrest, defendant pled guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). He was sentenced to five years in State prison with forty-two months period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

Defendant is appealing from his conviction, sentence, and the order denying his motion to suppress physical evidence. On appeal, defendant presents the following arguments for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING SUPPRESSION WHERE DEFENDANT WAS ONE OF SIX MEN THAT POLICE STOPPED AND FRISKED WITHOUT A VALID BASIS TO DO SO.

A. The Police Did Not Have A Reasonable And Articulable Belief That Defendant And His Three Friends Were Involved In Criminal Activity. It Is Clear From The Evidence That The Four Men Were

Stopped For The Same Reason The Other Two Men Were Stopped: "Due To The Area."

B. The Trial Judge Erred In Finding That The Alleged "Blading" Provided A Valid Basis To Frisk The Four Men When Detective Wizbicki Did Not Offer "Blading" As A Basis For The Frisk And Specifically Testified That It Is Police Practice To Conduct A Frisk For Weapons Whenever An Individual Is Stopped.

C. The Alleged "Blading" Did Not Provide Reasonable Suspicion To Believe That Any Of The Four Men Were Armed And Dangerous.

D. Conclusion: Encouraging Judges To Give Uncritical Deference To An Officer's Suspicions Of Criminal Activity And Dangerousness Creates The Potential For Racially Discriminatory Stops and Frisks.

Because the State failed to establish that the search of defendant was based on a reasonable suspicion that he was armed, we reverse.

I.

We discern the facts from the record on the motion to suppress. Only one witness testified at the hearing: Detective Alexander Anthony Wizbicki. Defendant offered into evidence the body worn camera footage from Detective Wizbicki and Officer Samantha Devine.

Detective Wizbicki testified that on November 21, 2022, around 8 p.m., he and other officers of the Narcotics Gang Unit (NGU) were conducting an

operation in the area of Leonard Avenue and Federal Street in the City of Camden. He explained that they were in this area because it is an area known for the open-air drug market and there had been recent shootings. Detective Wizbicki added that they had received information informing their operation.[1]

He testified that during the operation, the officers observed four males, wearing heavy dark clothing and ski masks, standing on the northern side of Leonard Street. There were two other males at the other end of the street. He explained that the officers observed a heavy amount of foot traffic in the area leading to those four males. Detective Wizbicki further explained that after observing the pedestrians "coming onto the set," the officers approached the four males on the sidewalk. One of the four males was observed concealing himself in between two cars and immediately breaking contact. Detective Wizbicki testified that the males would have been charged for loitering based upon the officers' observations; however, no such charges were filed against defendant.

After making these observations, the detective explained that the marked police units were notified to conduct stops. As the marked patrol cars drove

_____

[1]  Later in the hearing, in response to a question from the court regarding the information the detective received, defendant objected. Prior to the hearing, the State represented that it had no intention of relying on information received from a confidential informant.

down the street toward the four males, Detective Wizbicki testified the males began to blade their bodies away from the police car. He described blading as shifting one's body away from the officers. Detective Wizbicki further testified that because "they're trying to shift their body away from [the] officers," he believed the individuals may be dangerous.

Based upon these observations, the four males, including defendant, were detained in handcuffs. Detective Wizbicki concluded that several factors, such as recent violence in the area; the area being poorly lit; the "foot traffic coming in; one of the males breaking off;" and the males "concealing themselves in between the cars," led to the investigatory detention of the males. Here, Detective Wizbicki confirmed that all four males were frisked when they were detained. The detective testified that it is common practice for an officer to frisk an individual being detained.

Detective Wizbicki acknowledged that he was not involved with the stop or frisk of the males, including defendant. By the time he had arrived, the frisk of defendant was underway. The frisk of defendant resulted in the officer retrieving a Glock 26 Gen5 firearm on defendant's person. He was then arrested and a search incident to his arrest was conducted. The search revealed narcotics.

A-0729-23

After Detective Wizbicki arrived on the scene, and after defendant had been detained and frisked, he searched the surrounding area. Detective Wizbicki explained that it is common practice to search the immediate area because often contraband is stashed in various locations. While searching the immediate vicinity, Detective Wizbicki found narcotics and a firearm on the front driver-side tire of a blue Hyundai parked approximately seven to ten feet from the four males. Defendant was not charged with possession of these items.

At the close of the suppression hearing on July 25, 2023, the court issued an order denying defendant's motion to suppress and placing the reasons for its decision on the record. The court found Detective Wizbicki testified "credibly." The court concluded that the totality of the circumstances, including the observations made of the males in an area known for narcotic sales, arrests and a recent shooting, provided the officers with reasonable suspicion of criminal activity and that defendant was armed and dangerous.

The court found the number of males on the street significant together with the officers' observations of one of the four males going in between vehicles after a pedestrian came up to the group. The court stated,

> [T]his is suspicious behavior on this street known for, as he called it the open-air market sale of narcotics. The detectives observed the males, those four, concealing themselves in between the two vehicles at

A-0729-23

times and as explained the law enforcement who were conducting surveillance noticed one of the four males in all dark, all black clothing being approached by unknown pedestrians in the area and then going in between those two vehicles.

The court found the "blading" by one or more of the males "very significant," because "[Detective Wizbicki] explained that that is something that gives the officers and in his experience reason to believe these individuals might be armed."

The court concluded that this suspicious activity coupled with the blading when the patrol cars approached justified an investigatory detention and frisk. Additionally, the court found that while the four males were being detained in handcuffs and frisked, Detective Wizbicki and other officers searched the vicinity. Within proximity to the males, the officer found a gun and narcotics stashed in a tire wheel. Defendant was not charged, however, with any criminal offenses relating to the gun and narcotics found on the tire wheel.

II.

"Our standard of review on a motion to suppress is deferential – we 'must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record.'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Ahmad, 246 N.J. 592,

A-0729-23

609 (2021)). We recognize that a trial court is in the best position to "have the 'feel' of the case", so we do not disturb those findings unless they are clearly mistaken. Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)). A court's legal conclusions, however, are not entitled to the same deference; we review those legal conclusions de novo. Ibid. (citing State v. Hubbard, 222 N.J. 249, 263 (2015)).

Both the United States Constitution and the New Jersey Constitution protect individuals from "'unreasonable searches and seizures' by government officials." State v. Hagans, 233 N.J. 30, 38 (2018) (quoting State v. Watts, 223 N.J. 503, 513 (2015)). Warrantless searches are presumed invalid. Ibid. (citations omitted). To overcome this presumption, "the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure 'falls within one of the few well-delineated exceptions to the warrant requirement.'" Elders, 192 N.J. at 246 (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

It is the State's burden to prove the validity of its actions in the chain of events. See ibid. "Because our constitutional jurisprudence evinces a strong preference for judicially issued warrants, the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls

A-0729-23

within one of the few well-delineated exceptions to the warrant requirement.'" State v. Mann, 203 N.J. 328, 337-38 (2010) (quoting Elders, 192 N.J. at 246).

The exception at issue in this case is the stop and protective frisk. A Terry[2] stop and a frisk are analyzed based upon the totality of the circumstances. The circumstances must be assessed in an objective manner. See State v. Gamble, 218 N.J. 412, 430 (2014). While the same facts may justify both an investigatory stop and a frisk, the inquiries are not identical.

In analyzing the totality of the circumstances leading up to a stop and frisk, New Jersey's Supreme Court has recognized that the "reputation of an area may be relevant to the analysis . . . . " Goldsmith, 251 N.J. at 400. However, the Court has also held "that [j]ust because a location to which police officers are dispatched is a high-crime area 'does not mean that the residents in that area have lesser constitutional protection from random stops.'" Ibid. (quoting State v. Chisum, 236 N.J. 530, 549 (2019)).

A.

We begin with the first component regarding the level of reasonable suspicion that warrants an investigatory stop or detention. Generally, "the police

_____

[2] Terry v. Ohio, 392 U.S. 1 (1968).

may not randomly stop and detain persons without particularized suspicion." State v. Shaw, 213 N.J. 398, 409-10 (2012) (citing Terry, 392 U.S. at 9). An investigatory stop does not offend the federal or state constitutions "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Nyema, 249 N.J. 509, 527 (2022) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)); Terry, 392 U.S. at 1.

An investigatory detention is intended to be a "relatively brief detention by police during which a person's movement is restricted." Goldsmith, 251 N.J. at 399 (citing State v. Rosario, 229 N.J. 263, 272 (2017)). "It must be based upon an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" Chisum, 236 N.J. at 545 (quoting Rosario, 229 N.J. at 272) (internal citation omitted). "Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry . . . . " Nyema, 249 N.J. at 528 (citing State v. Privott, 203 N.J. 16, 25-26 (2010)). We acknowledge that this inquiry considers a number of factors, including the "officer['s] experience and knowledge." Goldsmith, 251 N.J. at 400 (citing Pineiro, 181 N.J. at 22).

A-0729-23

B.

The next inquiry focuses on the lawfulness of the frisk.  The <u>Terry</u>[3] case permits "a law enforcement officer, for his own protection and safety, [to] conduct a pat down to find weapons that he reasonably believes, or suspects are then in the possession of the person he has accosted."  <u>Ybarra v. Illinois</u>, 444 U.S. 85, 93 (1979) (citing <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)).  To conduct a frisk, "the officer must be able 'to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.'"  <u>State v. Thomas</u>, 110 N.J. 673, 679 (1988) (quoting <u>Sibron v. New York</u>, 392 U.S. 40, 64 (1968)).

Applying the well-settled law to the facts of this case, we conclude the State failed to establish that Detective Wizbicki and the other officers had reasonable suspicion to stop defendant or to frisk him and that the court erred in denying the motion to suppress.

Detective Wizbicki testified that the officers were in that area that evening because it was an "open-air drug market" and because of "recent shootings within that area."  Detective Wizbicki, however, had no specific information linking defendant to such conduct.  While observing these males, Detective

---

[3]  <u>Terry</u>, 392 U.S. at 1.

Wizbicki did not observe defendant engage in any particularized behavior that would have led the officers to believe he was engaged in criminal activity, such as seeing defendant engage in any hand-to-hand transactions or furtive gestures. Defendant did not flee the area as the officers approached him and restrained his movement prior to him being handcuffed as shown in the body worn camera footage of Officer Devine.

Detective Wizbicki's familiarity of the neighborhood factored into his suspicion that evening as well. He testified that he conducted narcotics arrests and knew of other narcotic arrests made in this area. However, there was no testimony that he had specific information or was familiar with any criminal history defendant may have had that factored into his analysis. See Privott, 203 N.J. at 28-29. This area was also a residential area, as the court observed. The Supreme Court has held, "the reputation of an area may be relevant to the analysis," but it does "not mean that the residents in that area have lesser constitutional protection from random stops." Goldsmith, 251 N.J. at 400 (quoting Chisum, 236 N.J. at 549).

We recognize that the detective's observations that evening must be viewed through his lens as an experienced and trained officer of the NGU. According to Detective Wizbicki, the suspicious conduct included an

unspecified number of individuals, described only as "heavy foot traffic," in an area where narcotic arrests had been made, and this "foot traffic" led to the four males standing on the street. Detective Wizbicki added that one of the males was seen "concealing" himself in between two cars and "immediately breaking contact." He did not specify how long the officers observed the males, the approximate number of pedestrians in the area, or how many approached the group, or whether defendant was the individual who went in between the cars and "conceal[ed]" himself. Detective Wizbicki did not describe which cars these individuals were seen going in between. There was no testimony regarding any observed hand-to-hand transactions.

The individuals seen that evening wore dark clothing, and the area was poorly lit, according to Detective Wizbicki. These additional facts, however, add little to this analysis.

Prior to conducting the investigatory detentions, the officers did not approach the males and engage in a field inquiry. Rather, after observing "one of the four males" "concealing themselves in between two cars and immediately breaking contact," the officers detained the four individuals, including defendant, in handcuffs. The detective failed to explain what specific unlawful conduct the officers believed defendant was engaged in or was imminently about

13

to engage in to justify the detention. Aside from defendant's presence on the street that evening, "none of [the] factors [testified to by Detective Wizbicki were] specific to defendant engaging in behavior indicative of criminal activity." Goldsmith, 251 N.J. at 406 (emphasis omitted).

Even were we to agree that these facts provided reasonable suspicion to justify an investigatory detention of defendant, there was insufficient evidence to support the detective's conclusion that defendant was armed and dangerous, thereby justifying a Terry frisk. Detective Wizbicki testified in a conclusory manner that as the marked patrol car approached, "the males" began to "blade their bodies away" as the cars came down the street. Blading, as the detective explained, means to shift one's body away – in other words, to turn away from the approaching car.

This ambiguous conduct, however, was not linked specifically to defendant. Moreover, our well-settled jurisprudence has held that furtive movements without more is "insufficient to constitute reasonable and articulable suspicion." Goldsmith, 251 N.J. at 400 (citing Rosario, 229 N.J. at 227). Blading, analogous to furtive movements, alone is insufficient to give rise to a reasonable belief that a person is armed and dangerous.

14

Without particularized suspicion to frisk an individual, Detective Wizbicki acknowledged that it is "commonplace practice" to frisk a person who is detained without specifically having reasonable suspicion that the person is armed and dangerous. This practice contravenes our jurisprudence. Based on the totality of these circumstances, we conclude the court erred in finding that both the investigatory detention and frisk were lawful.

III.

For the first time on appeal, the State relies upon the inevitable discovery doctrine to justify the seizure of the contraband from defendant's person. Specifically, the State argues that even if the court determined that the contraband on defendant's person was unlawfully obtained, the evidence would have been inevitably discovered and therefore should be admitted.

Ordinarily, "the principal remedy for [a] violation of the constitutional right to be free from unreasonable searches and seizures is exclusion of the evidence seized [unlawfully]." State v. Shaw, 237 N.J. 588, 620 (2019) (quoting State v. Bryant, 227 N.J. 60, 71 (2016)). The inevitable discovery doctrine provides an exception to the exclusionary rule. Ibid. (citing State v. Smith, 212 N.J. 365, 393-95 (2012)). This doctrine arose from the recognition that "the exclusionary rule's purpose of preventing the use of evidence unlawfully

obtained by law enforcement is not served – especially in light of the heavy societal cost – where the police would have inevitably discovered the evidence." Id. at 620-21 (citing State v. Sugar, 100 N.J. 214, 237 (1985)).

To rely on the inevitable discovery doctrine, the State must establish by clear and convincing evidence the following:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case;
>
> (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and
>
> (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Id. at 621 (quoting Smith, 212 N.J. at 391).]

Defendant contends that because the State did not raise the inevitable discovery doctrine before the trial court, it should be deemed waived. State v Witt, 223 N.J. 409, 419 (2015) (citing State v. Robinson, 200 N.J. 1, 20 (2009)). In New Jersey,

> [i]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised

on appeal go to the jurisdiction of the trial court or concern matters of great public interest.

[Robinson, 200 N.J. at 20 (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).]

The State had an opportunity to present this argument at the suppression hearing and develop the record in support of it but did not do so. Thus, we decline to consider the State's alternate argument raised for the first time on appeal. Witt, 223 N.J. at 419.

In conclusion, the totality of the information possessed by Detective Wizbicki did not amount to an objectively reasonable and articulable suspicion that defendant was involved in criminal activity or that he was armed and dangerous. Consequently, the motion to suppress should have been granted. We, therefore, reverse the court's order denying defendant's motion to suppress the handgun and any other evidence seized from defendant, vacate defendant's conviction and sentence under Indictment 23-02-0326, and remand for further proceedings.

Reversed, vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0729-23