**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3048-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRYAN B. CALCOTT, a/k/a
BRYAN C. CALCOTT,
BRYAN BRENT CALCOTT,
BRYAN CALCOTT, BRENT
BRYAN CALCOTT, B.
CALCOTT, GINO PIRRI, and
WESLEY ROBERT VOLIKAS,

    Defendant-Appellant.

_____

Submitted January 30, 2020 – Decided June 15, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-04-0556.

Chiesa Shahinian & Giantomasi PC, attorneys for appellant (Lee D. Vartan and Brigitte M. Gladis, on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Following the denial of his motion to suppress evidence seized in a warrantless search, defendant Bryan B. Calcott entered a guilty plea to first-degree possession of a controlled dangerous substance (marijuana) with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(10)(a). Pursuant to the negotiated plea agreement, the second count of the indictment, charging him with fourth-degree possession of more than fifty grams of marijuana, N.J.S.A. 2C:35-10(a)(3), was dismissed. On February 8, 2019, defendant was sentenced as a second-degree[1] offender—not a first-degree offender—to seven and one-half years flat. Appropriate fines and penalties were also imposed. Defendant now appeals denial of his suppression motion as well as the sentence. Finding no basis to disturb the Law Division judge's factual findings or legal conclusions, we affirm.

---

[1] The judgment of conviction does not appear to indicate that defendant was sentenced as a second-degree offender to the seven and one-half years imprisonment.

The following facts were established in the suppression hearing, in the main through the testimony of Port Authority Police Detective Sergeant Gabriel Scudese. On December 12, 2012,[2] defendant boarded a private jet, which had been chartered for a group of four golfers at a cost of $25,000. He was the lone passenger, and carried with him two leather briefcases and two rectangular containers, one three by four feet, the other slightly smaller. When the pilot spoke to him before departure from the San Diego airport, defendant introduced himself as "Bryan," but then used the name "Chris." He showed the pilot a photocopy of a driver's license he claimed was his, in the name of "Christopher Walkup." Defendant also told him he was carrying electronic equipment in the containers.

The pilot contacted the Drug Enforcement Administration (DEA) regarding his suspicion defendant was transporting contraband. The plane was traveling to Teterboro Airport, thus the California-based DEA agent relayed the information to New Jersey DEA Special Agent Kevin O'Grady, who in turn reached out to the Port Authority Police. The plane arrived in New Jersey at approximately 9:10 p.m. Defendant took a shuttle from the plane to the terminal,

---

[2] After the seizure at issue, defendant was permitted to leave—the authorities were unable to locate him until August 27, 2015. He was found living in Colorado under an assumed name.

where Scudese and DEA agents boarded the bus and asked him for identification. Defendant's arm was shaking so badly he could not retrieve his wallet until after four attempts. He seemed extremely nervous. Defendant showed the officers a California driver's license in his name.

When Scudese asked defendant for permission to search the containers, he refused. He claimed he worked for a hedge fund called "Faith Water Capital" and was transporting "prototypes" to a client in New York City. He also claimed he signed a non-disclosure agreement with his employer that meant he could not open the boxes without his employer Christopher Walkup's express permission. Defendant produced no verification of his narrative, such as a business card, and said he had only been working for the hedge fund for three months. Scudese asked him to contact his employer, which defendant was unable to do. Scudese checked and could not locate a business by the name defendant gave, nor any business entity at that address.

Defendant accused Scudese and the others of being DEA agents, although none of the officers had identified themselves as working for the DEA. He told them the DEA had arrested him in the past for conspiracy to distribute cocaine, and that since then the DEA had investigated and harassed him. Defendant became upset and began to raise his voice. When asked by the officers why he

thought they were looking for drugs, defendant responded "[w]hat else would you be looking for?"

Defendant asked if he was under arrest, and the officers told him he was free to go, but the containers would be subjected to a "sniff" by a canine unit. Scudese told defendant if the sniff proved negative, he would be free to leave with the containers. Defendant did not want to wait.

When asked if he was not concerned about abandoning boxes containing electronics prototypes, defendant told Scudese that he would let "the lawyers deal with it." He left the terminal at approximately 9:30 p.m., some twenty minutes after he disembarked from the plane. He was driven away by a vehicle that had been waiting for him. After defendant left, Scudese coordinated surveillance. He was driven into Manhattan.

Once he had arranged for defendant to be followed, Scudese contacted the Port Authority Canine Unit, only to find it was not available. He next called the Bergen County Police, and at approximately 9:55 p.m., confirmed that a canine unit could respond. The dog and handler arrived at approximately 10:29 p.m., and within minutes the dog alerted to the presence of narcotics. A search warrant was thereafter obtained and the containers opened. 109 pounds of marijuana were found inside.

A-3048-18T2

The judge who denied the motion to suppress concluded that the "encounter with Calcott began as a field inquiry" when the officers boarded the shuttle bus. The matter became an investigatory detention when defendant displayed signs of extreme nervousness, had significant difficulty producing his identification, and explained his refusal to open the containers for inherently suspect reasons that could not be corroborated. Additionally, he accused the officers of being DEA agents looking for drugs.

The judge found Scudese to be credible and highly experienced, and held the officers had a reasonable and articulable suspicion that defendant was engaged in criminal activity. He phrased the issue for decision to be whether the length of "the investigatory detention was unnecessarily prolonged such that it became a de facto arrest that was unconstitutional." Noting that defendant was not handcuffed, and was permitted to leave after approximately fifteen minutes, the judge found it was constitutional.

The judge similarly found the "continued temporary detention" of the containers to also be constitutionally permissible under the authority of United States v. Place, 462 U.S. 696 (1983). Reasonable suspicion was necessary to trigger the use of a canine, and such suspicion existed. The judge distinguished his decision from Place because it would have been premature for police to

6

request the services of a canine unit before investigating the tip upon defendant's arrival in Teterboro. This defendant, unlike the defendant in Place, was offered the option of remaining with the containers at the terminal until a canine unit could be located. He was allowed to take his leather briefcases, and made the choice to leave the containers behind. The containers were in police custody essentially from 9:15, when the officers boarded the shuttle bus, until 10:35, when the dog alerted to the presence of narcotics.

The judge opined the police diligently took all steps necessary to promptly conduct the canine sniff with the least inconvenience to defendant, who was permitted to go on his way. Thus, the extent of the delay was minimal in light of probable cause to at least search.

On appeal, defendant raises the following points of error:

> POINT I
> STANDARD OF REVIEW.
>
> POINT II
> THE APRIL 27, 2018 ORDER SHOULD BE REVERSED AND THE JUDGMENT OF CONVICTION VACATED BECAUSE THE SUPERIOR COURT IGNORED THE SUPREME COURT'S DECISION IN UNITED STATES V. PLACE.
>
> POINT III
> THE APRIL 27, 2018 ORDER SHOULD BE REVERSED AND THE JUDGMENT OF

CONVICTION VACATED BECAUSE THE SUPERIOR COURT FOUND THAT THERE WAS PROBABLE CAUSE TO SEARCH MR. CALCOTT'S LUGGAGE WHEN THERE WAS NOT.

## I.

"Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference should be given to the trial court's findings. Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). An appellate court may reverse a trial court's factual findings only if they "are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid.

Deference is not given to "[a] trial court's interpretation of the law" or "the consequences that flow from established facts." Gamble, 218 N.J. at 425. "Therefore, a trial court's legal conclusions are reviewed de novo." Ibid.; see also State v. Gandhi, 201 N.J. 161, 176 (2010).

When the facts of a case are not in dispute, the only issue to be decided is whether the trial court properly concluded that the State did or did not meet its "burden in proving the constitutionality of the warrantless search." State v. Edmonds, 211 N.J. 117, 128-29 (2012). The State must prove "by a

A-3048-18T2

preponderance of the evidence that there was no constitutional violation." State v. Wilson, 178 N.J. 7, 13 (2003) (citing State v. Whittington, 142 N.J. Super. 45, 51-52 (App. Div. 1976)).

II.

Defendant's first point asserts the judge misapplied the holding in Place. We do not agree. Facilitating a dog sniff by holding luggage for an extended period of time is a seizure. Place, 462 U.S. at 707-10. In this case, however, the timeframe was simply not excessive and probable cause existed.

Some additional principles warrant restatement. A canine sniff itself is not a search. See id. at 707. The New Jersey Supreme Court has said officers must have reasonable and articulable suspicion to hold a suspect beyond the time necessary for a routine traffic stop. State v. Dunbar, 229 N.J. 521, 540 (2017). A three and one-half hour detention at a state police barracks of a vehicle and its occupants while awaiting a canine team has been found to be excessive and unreasonable. State v. Dickey, 152 N.J. 468, 479 (1998).

Once these officers had a reasonable and articulable suspicion to subject defendant's luggage to a canine sniff, defendant was not even detained. Unlike Place, it would have been easy for defendant to return to the Teterboro Airport to recover his luggage. The delay between stop and sniff was slightly over an

hour, not unreasonable since the officers allowed defendant to go on his way after a few minutes. Defendant was not under arrest. He knew the containers were going to be checked by a drug detection dog and chose to leave rather than remain.

In Place, the officers at the defendant's departure point had obtained his consent to search, but allowed him to leave because otherwise he would have missed his plane connection. Place, 462 U.S. at 698. Once he arrived in New York, he was again allowed to leave, but the agents took his bags from the LaGuardia Airport to Kennedy Airport, and the detention of his luggage exceeded ninety minutes. Id. at 699. The Court concluded that the authorities had ample time to arrange for the canine unit after the defendant left Miami and did not do so, exacerbated by the officers' failure to let Place know where the luggage was being taken, and the steps he could take to recover them if the investigation uncovered nothing illegal. Id. at 709-10.

Scudese had nothing but triple hearsay to act upon, so his decision not to contact a canine unit to check the luggage immediately once defendant arrived was a reasonable effort at husbanding scant resources.

# III.

Probable cause is more than a mere suspicion, but less than evidence necessary to convict. See State v. Basil, 202 N.J. 570, 585 (2010). Defendant's responses, demeanor, and conduct gave rise to probable cause, thus the officers were justified in at least holding the luggage. At that juncture, they had a well-grounded suspicion that the boxes contained contraband. See State v. Chippero, 201 N.J. 14, 28 (2009). They had probable cause to search, and the timeframe the luggage was detained was therefore reasonable.

The totality of the circumstances established that defendant was transporting contraband. The flight was booked for four, yet only one passenger appeared. His inconsistent volunteered statements to the pilot regarding his identity, his extreme nervousness, his possession of a driver's license in a name different than the photocopy he showed the pilot, his fanciful explanation for the contents of the boxes, his identification of an employer which could not be corroborated, and his accusation that the officers were DEA agents who were continuing to harass him are damning circumstances. The argument that these factors did not constitute probable cause in light of the totality of the circumstances has no merit. See State v. Gibson, 218 N.J. 277, 293 (2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11