SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Nazier D. Goldsmith (A-77-20) (085636)**

**Argued January 18, 2022 -- Decided July 5, 2022**

**PIERRE-LOUIS, J., writing for the Court.**

In this case, the Court must determine whether reasonable and articulable suspicion existed when a police officer conducted an investigatory stop of defendant Nazier Goldsmith on a walkway adjacent to a vacant house.

On the evening of January 15, 2019, Officer Joseph Goonan and another officer were on patrol in Camden in what they believed to be a "high-crime area" known for shootings and drug dealing. While approaching the vacant house, the officers observed two individuals standing in front of it. When the officers exited their vehicle, the two individuals walked away. At the same time, a third person, defendant, exited the walkway that leads to the rear of the house.

Based on his training, 20 years of experience, and his belief that the vacant house was used for the sale of drugs and weapons, Officer Goonan found it suspicious that defendant was on the walkway next to the vacant house and believed defendant was engaged in drug dealing activity. The officers approached defendant, blocked his path at the end of the walkway, and began questioning him, asking for his name and for an explanation of his presence on that walkway.

According to Officer Goonan, defendant became nervous and looked up and down the street; he started sweating, and his hands began to shake. Defendant provided a name and informed officers that his identification was in his jacket pocket. Because defendant's demeanor made him nervous, Officer Goonan told defendant that he would retrieve the identification from defendant's pocket. At that point, defendant stated, "I appreciate if you guys didn't pat me down," arousing Officer Goonan's suspicions even further.

Officer Goonan conducted a pat down for weapons. The officer felt a weapon in defendant's jacket pocket and retrieved a handgun. Defendant was arrested, and police later recovered currency and drugs from defendant's person. A search of the walkway revealed drugs in baggies that were the same color as the baggies of drugs found in defendant's pockets.

1

Defendant was charged with weapons and drug offenses. Defendant moved to suppress the gun and drugs, arguing that both the stop and frisk were unlawful. The trial court granted the motion, finding the stop lawful but the frisk unlawful. The Appellate Division reversed. Without addressing the initial stop, the appellate court found that the frisk of defendant was objectively reasonable. The Court granted leave to appeal. 248 N.J. 3 (2021).

**HELD:** The information the officers possessed at the time of the stop did not amount to specific and particularized suspicion that defendant was engaged in criminal activity. Therefore, the officers did not have reasonable and articulable suspicion to initiate an investigatory detention of defendant, and the evidence seized must be suppressed.

1. An investigative or <u>Terry</u> stop, <u>see</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), is a relatively brief detention by police during which a person's movement is restricted. Such a stop does not offend the Federal or State Constitution, and no warrant is needed, if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity. Although reasonable suspicion is a less demanding standard than probable cause, it cannot be based on inarticulate hunches or an arresting officer's subjective good faith. Whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions. The inquiry considers numerous factors, including officer experience and knowledge. It is well-settled that seemingly furtive movements by the suspect, without more, are insufficient to constitute reasonable and articulable suspicion. And although the reputation of an area may be relevant to the analysis, just because a location to which police officers are dispatched is a high-crime area does not mean that the residents in that area have lesser constitutional protection from random stops. (pp. 17-20)

2. To determine whether reasonable and articulable suspicion existed here, the Court first considers when the investigatory stop commenced. Although officers did not tell defendant to "stop" when he exited the walkway, they blocked his path, and Officer Goonan acknowledged that defendant could not have moved forward freely at that point. No reasonably prudent person would have felt free to leave when officers stepped into the only path of egress and began asking questions, leaving defendant no place to go but backwards. The moment officers impeded defendant's forward progress and began the questioning, the encounter became an investigatory detention or stop. (pp. 20-22)

2

3. Turning to whether officers had reasonable and articulable suspicion to stop defendant at that point in time, the Court stresses that Officer Goonan unequivocally testified that he did not witness defendant interact with or engage in a hand-to-hand transaction with the two men that left the scene, contrary to the trial court's finding that the two men were with defendant. As for defendant's presence in a high-crime area, the Court continues to view the impact of previous crimes in the same area as a police encounter as a factor to be considered in the totality of the circumstances when determining whether a stop was based on reasonable suspicion. However, the State must do more than simply invoke the buzz words "high-crime area" in a conclusory manner to justify investigative stops. Here, Officer Goonan's vague testimony fell short of providing factual support for his conclusory statement that the area was high crime. The State must provide at least some evidence to support the assertion that a neighborhood should be considered as "high-crime." (pp. 22-26)

4. Here, even if Officer Goonan had provided more information regarding the prevalence of crime in the area, that would have been insufficient to justify the stop because the other factors on which the officers relied were also insufficient -- even when taken together -- to form a reasonable and articulable suspicion that defendant was engaged in criminal activity. The only information the officers possessed prior to the stop was information that could be used to justify the stop of virtually anyone, on any day, and at any time, based simply on their presence on that street. Officer Goonan had a hunch that defendant was engaged in criminal activity. That hunch, however, did not amount to objectively reasonable and articulable suspicion for an investigatory stop. Because the stop here was unlawful, the Court does not reach the lawfulness of the frisk. (pp. 26-28)

**REVERSED. REMANDED for REINSTATEMENT of the suppression order.**

**JUSTICE SOLOMON, dissenting,** would defer to the trial court's conclusion as to the point at which defendant's encounter with the police became an investigative detention. Justice Solomon notes that the trial court had before it a key piece of evidence -- a photograph of the walkway next to the vacant house -- that is missing from the record on appeal. In Justice Solomon's view, the majority's conclusion that the officers blocked defendant's path forward is not supported by the record, and the trial court's conclusion that the seizure began when the officers asked defendant for identification was not so clearly mistaken that the interests of justice demand intervention and correction through appellate review.

**CHIEF JUSTICE RABNER; JUSTICE ALBIN; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins.**

3

SUPREME COURT OF NEW JERSEY
A-77 September Term 2020
085636

State of New Jersey,

Plaintiff-Respondent,

v.

Nazier D. Goldsmith,

Defendant-Appellant.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 18, 2022 | July 5, 2022 |

Ashley Brooks, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender; attorney; Ashley Brooks, of counsel and on the briefs).

Rachel M. Lamb, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Rachel M. Lamb, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Jeanne LoCicero, and Karen Thompson, on the brief).

1

Jennifer B. Condon submitted a brief on behalf of amicus curiae Dr. Jeffrey Fagan, PhD (Seton Hall Law School, Center for Social Justice, attorneys; Jennifer B. Condon, on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, we must determine whether reasonable and articulable suspicion existed when a police officer conducted an investigatory stop of defendant Nazier Goldsmith on a walkway adjacent to a vacant house. Two police officers were on patrol in Camden in what they believed to be a "high-crime area" known for shootings and drug dealing. While approaching the vacant house, the officers observed two individuals standing in front of it. When the officers exited their vehicle, the two individuals walked away. At the same time, a third person, defendant, exited the walkway that leads to the rear of the house.

Based on his training, 20 years of experience, and his belief that the vacant house was used for the sale of drugs and weapons, Officer Joseph Goonan found it suspicious that defendant was on the walkway next to the vacant house and believed defendant was engaged in drug dealing activity. So the officers approached defendant, blocked his path at the end of the walkway, and began questioning him, asking for his name and for an explanation of his presence on that walkway.

2

According to Officer Goonan, defendant became nervous and looked up and down the street; he started sweating, and his hands began to shake. Defendant provided a name and informed officers that his identification was in his jacket pocket. Because defendant's demeanor made him nervous, Officer Goonan told defendant that he would retrieve the identification from defendant's pocket. At that point, defendant stated, "I appreciate if you guys didn't pat me down," arousing Officer Goonan's suspicions even further.

Officer Goonan conducted a pat down for weapons. The officer felt a weapon in defendant's jacket pocket and retrieved a handgun. Defendant was arrested, and police later recovered currency and drugs from defendant's person. A search of the walkway revealed drugs in baggies that were the same color as the baggies of drugs found in defendant's pockets.

Defendant was charged with weapons and drug offenses. Defendant moved to suppress the gun and drugs, arguing that both the stop and frisk were unlawful because they were not based on reasonable suspicion.

The trial court granted the motion, finding the stop lawful but the frisk unlawful. Because the trial court held the frisk to be unlawful, all the seized evidence (the gun, ammunition, drugs, and money) was suppressed as fruit of the poisonous tree.

The Appellate Division reversed. The Appellate Division did not address the initial stop of defendant, analyzing instead only whether the frisk was objectively reasonable. The Appellate Division found that based on the totality of the circumstances -- including defendant's presence in a high-crime area and his behavior and body language -- the officer's frisk of defendant was objectively reasonable.

We granted defendant's motion for leave to appeal regarding whether officers had reasonable and articulable suspicion to stop and frisk him. We find that the information the officers possessed at the time of the stop did not amount to specific and particularized suspicion that defendant was engaged in criminal activity. Therefore, the officers did not have reasonable and articulable suspicion to initiate an investigatory detention of defendant. We reverse the Appellate Division's judgment and reinstate the trial court's suppression order. Because the initial stop was unlawful, we need not reach the issue of the frisk of defendant.

I.

We rely on the testimony from the suppression hearing for the following summary.

Officer Goonan was the only witness to testify at the hearing. Officer Goonan testified that as part of his role in the Special Investigations Bureau,

4

he patrolled high-crime areas to look for drugs and weapons, and when he saw a possible fugitive, he would ask the person for identification. He stated that in his 20 years of experience, he had witnessed hundreds of drug transactions, which he described as a buyer walking up to another person and exchanging currency for small objects. Officer Goonan said that in his experience, drugs are often stashed in alleyways. He further testified that he had recovered over 50 firearms and that, in his experience, firearms are commonly present at drug transactions.

Officer Goonan explained that on the evening of January 15, 2019, at approximately 6:00 p.m., he and another officer from the Camden County Sheriff's Office were on patrol in Camden. Officer Goonan testified that they were patrolling the 1600 block of Holcaine Street, which Officer Goonan identified as a "high-crime area" known for shootings and open-air drug transactions. The officers approached a vacant house, where they believed drugs were sold and weapons stored.[1] According to Officer Goonan's testimony, the officers observed two individuals standing in front of the vacant

---

[1] Officer Goonan did not testify as to how the officers knew the vacant house was a location where drugs and weapons are sold, except for testifying that after observing defendant in the walkway, he suspected "somebody was dealing drugs . . . because of the numerous reports [he had] been having in the area."

5

house who walked away when the officers exited their vehicle. Although the officers were not in uniform, they were wearing tactical vests marked with the word "police" on the front and back. Officer Goonan stated that the officers did not attempt to stop the two individuals, but that he "radioed to . . . another car in the area the description of the two males that walked off."

The following is an excerpt from Officer Goonan's testimony regarding his observations and conclusions:

> PROSECUTOR: And can you describe what you saw around 6 p.m. that day?
>
> OFFICER GOONAN: Yeah. I was riding with my partner at the time to come around the corner and observed two males standing out front of the property, what's known where the drugs are usually sold. As we made our approach we exited our vehicles. They walked away and at the same time I observed a male coming out of the alleyway, I'm not sure of the house address --
>
> PROSECUTOR: Okay.
>
> OFFICER GOONAN: -- but it was -- it's a vacant house, but it was an alley between -- along the side of it.
>
> PROSECUTOR: So it was an abandoned house with an alleyway beside it?
>
> OFFICER GOONAN: Yes.
>
> PROSECUTOR: And what did you think when you observed that? Based on your training and experience, what was --

OFFICER GOONAN: The two -- the two men that were standing out front were there to purchase drugs.

PROSECUTOR: And did those two males see you?

OFFICER GOONAN: As we -- when we exited our vehicle. We drive unmarked vehicles.

PROSECUTOR: Okay. So can you describe the actual approach then?

OFFICER GOONAN: Came up to -- came up the street, like I said. It's only -- it's not even a full -- full block. It's, maybe, one block. We came up, we exited the vehicle, and at the same time [they] walked off and we observed a male come out of the alleyway.

. . . .

PROSECUTOR: And you said -- so you got out of your car and you're about to walk up to the male?

OFFICER GOONAN: Yeah. We were -- we were -- we pulled up. Like I said, they didn't recognize our car, the two guys standing on the street. So we were, basically, only a few feet from them.

PROSECUTOR: From -- from --

OFFICER GOONAN: The two males out front that walked off. And then the male, [defendant], who came out of the alleyway.

PROSECUTOR: Okay. And did you approach him?

OFFICER GOONAN: I did.

PROSECUTOR: And why is that?

7

OFFICER GOONAN:  To ask him why he was coming out of the alleyway.  It was vacant property.

PROSECUTOR:  Okay.  And why did you -- based on your training and experience, why did you think that was suspect?

OFFICER GOONAN:  That's a known drug area, and I observed a male coming out -- I call it an alleyway.  It's really not.  It's like a walkway, I guess, up against the side of a house.

PROSECUTOR:  Okay.  And --

OFFICER GOONAN:  To me that was suspicion somebody was dealing drugs.

PROSECUTOR:  And why was that suspicious?

OFFICER GOONAN:  Only because of the numerous reports I've been having in the area.

On cross-examination, Officer Goonan confirmed that the walkway on the side of the house led to a backyard.  Officer Goonan did not know whether multiple homes were accessible via that walkway and backyard or whether all the other surrounding properties were fenced in.  Officer Goonan further expressly confirmed that he did not witness a hand-to-hand transaction between defendant and the two men who walked away.

Upon approaching defendant, Officer Goonan did not recall the officers telling defendant to "stop" in order to initiate questioning him, but Officer Goonan testified that when defendant "came out of the alleyway, we were two -- two officers standing there."  Given where the officers were standing in

8

front of the walkway, they blocked defendant's path forward. According to Officer Goonan, defendant could not have moved forward freely, but "could run back up that walkway," essentially away from the officers.

The officers approached defendant and began questioning him. The officers asked for his name, where he was from, whether he lived in the area, whether he had identification on him, and for an explanation of his presence on the walkway. According to Officer Goonan, defendant became nervous, looked up and down the street, started sweating, and his hands began to shake. Officer Goonan believed defendant's behavior meant that defendant was "doing something he shouldn't be doing." Officer Goonan maintained that when the officers approached defendant, he was "free to leave" and neither detained nor under arrest.

Defendant provided a name and informed officers that his identification was in his jacket pocket. Because defendant's demeanor made him nervous, Officer Goonan told defendant that he would retrieve the identification from defendant's pocket. At that point, defendant stated, "I appreciate if you guys didn't pat me down." Officer Goonan testified that defendant's statement, in addition to defendant's nervous behavior, aroused Officer Goonan's suspicions even further. Officer Goonan testified that during the entire interaction with

9

the officers, defendant never reached for anything, was respectful, and did not threaten the officers.

Officer Goonan proceeded to conduct a pat down for weapons due to the officers' belief that defendant was engaged in drug activity and the nervous behavior he exhibited. During the pat down, Officer Goonan felt a weapon in defendant's jacket pocket and retrieved a handgun. Defendant was arrested, and police later recovered currency and drugs from defendant's pockets. A search of the walkway uncovered several other baggies of drugs that matched the color of the baggies found on defendant's person.

## II.

## A.

In October 2019, a Camden County grand jury charged defendant in a multiple-count indictment with second-degree unlawful possession of a weapon, fourth-degree possession of weapon or device, and third-degree possession of a controlled dangerous substance.

Defendant moved to suppress the evidence seized as the fruit of an unlawful stop and frisk. After a hearing, the trial court first held that the officers' stop of defendant was lawful. The court found that once the officers asked defendant for his identification, "what started as a field inquiry quickly escalated to an investigatory stop" that "must have been supported by

10

reasonable suspicion of criminal activity."  The court held that based on the

totality of the circumstances, defendant's detention was supported by

reasonable suspicion.  The court made the following findings:

> At the point where the encounter became an investigatory stop, Officer Goonan knew that defendant had been speaking with two other people after emerging from a walkway,[2] and those two people walked away upon seeing the officers.  This information had significant weight in arousing the officer's suspicion because he was in a high crime neighborhood.  Coupled with the fact that the officers observed defendant looking furtively, saw his hands shaking, and despite being early evening in January, noticed he was sweating profusely, established a reasonable, articulable suspicion that defendant was engaging in a drug offense.

The court recognized that although presence in a "high crime, high violence"

neighborhood "by itself is not sufficient to justify either a stop or frisk, it is

often cited as a suspicion factor when combined with other more

individualized suspicious circumstances."  The court concluded that

> [d]efendant's nervousness, after emerging from the walkway and coming in contact with two other individuals,[3] bolsters the suspicion that he was

---

[2]  Officer Goonan did not testify that he observed defendant speaking to the two individuals.

[3]  Despite the trial court's findings, Officer Goonan did not testify that defendant came in contact with the two individuals after emerging from the walkway.  Officer Goonan testified that the two individuals "walked away and at the same time [he] observed a male coming out of the alleyway."  Based on Officer Goonan's testimony at the hearing, it seems the two men walked off

11

> engaged in some form of wrongdoing, such as a drug offense, consistent with the officer's experience with respect to persons who come out of walkways in this high crime neighborhood.

The court then explained that simply because a stop is lawful, a lawful frisk does not always follow. The court held that officers did not have an objective basis to believe that defendant was armed and dangerous; the court also found that a belief a person possesses drugs cannot alone be a basis for the frisk. The trial court noted that the officers did not observe a bulge; the alleged drug-related crime was not a weapons-related offense; and defendant made no threatening movement. Noting that the officers had no prior contact with defendant and had no reason to believe he was dangerous, the court found defendant's nervous behavior insufficient to warrant a frisk. The court also stated that

> the fact that defendant asserted his right to be free from a frisk does not create the basis to believe defendant possessed a weapon. If the assertion of a right became a basis to establish the constitutionality of a search, then there would be no need for the Fourth Amendment's warrant requirement.

---

and then defendant emerged from the walkway. Thus, the officers did not see defendant interact or approach the two men at all since they were gone by the time defendant emerged.

Based on the finding that the frisk was unlawful, the court suppressed all the evidence seized, including the gun, ammunition, drugs, and money.

B.

The State filed an interlocutory appeal challenging the trial court's order suppressing the evidence. In the State's view, the court misapplied the investigatory frisk standard by failing to accept that the same reasonable suspicion underlying a lawful stop can also be the basis for a frisk. The State argued that it presented sufficient evidence of reasonable suspicion to frisk defendant.

In an unpublished opinion, the Appellate Division reversed the trial court's order granting defendant's suppression motion. The Appellate Division found that based on the totality of the circumstances, including defendant's presence in a high-crime area, "defendant's behavior and body language," and the officers' belief that drugs had just been sold, the officers' frisk of defendant was objectively reasonable. The court also noted that drug dealers are known to frequently carry weapons. The Appellate Division stated that if officers lawfully stop an individual, they may frisk the individual if they have a reasonable and articulable suspicion that the person is armed and dangerous. The Appellate Division relied on Officer Goonan's experience and training to conclude that, based on the circumstances, it was reasonable for

officers to believe they might be in danger and therefore it was proper to conduct the frisk. The Appellate Division did not address the initial stop of defendant because the trial court found the stop reasonable and the issue was not raised in the State's appeal.[4]

We granted defendant's motion for leave to appeal challenging the legality of both the stop and the frisk of defendant. 248 N.J. 3 (2021). We also granted leave to appear as amici curiae to the American Civil Liberties Union of New Jersey (ACLU) and Jeffrey Fagan, Ph.D., through counsel Jennifer Condon of Seton Hall University (Dr. Fagan).

## III.

Defendant argues that the Appellate Division erroneously reversed the trial court's suppression order. According to defendant, the appellate court found reasonable and articulable suspicion to stop defendant merely because he was a black man in a police-designated and targeted "high-crime area." Citing New Jersey's alarming racial disparities in policing, defendant insists that "police designate communities of color high-crime areas" based on

---

[4] In finding that the frisk was lawful, the Appellate Division noted that "the officer believed he had just witnessed a drug sale between defendant and the two unidentified men who quickly left the area." Officer Goonan testified that he suspected "somebody was dealing drugs," and that he thought the two men standing in front of the house were there to purchase drugs. Officer Goonan's testimony made clear that he did not witness a drug transaction, let alone any interaction between defendant and the two men.

14

"entrenched stereotypes and racial bias against people of color." Defendant further argues that officers did not have articulable suspicion that defendant was armed and dangerous. Defendant contends that the Appellate Division erroneously substituted its own judgment for that of the trial court, that the Appellate Division ignored New Jersey precedent that reasonable suspicion of a drug offense does not warrant a frisk, and that a suspect's reacting nervously to police interrogation cannot provide a basis for reasonable suspicion.

Amici Curiae, the ACLU and Dr. Fagan, echo defendant's arguments. Dr. Fagan emphasizes that research has shown that the characterization of a "high-crime area" is often linked to racial composition rather than crime rate. Dr. Fagan argues that the resulting over-policing of "high-crime areas" based on inaccurate data should not be a determinant of whether reasonable suspicion exists. The ACLU adds that the police seized defendant before they asked for his identification, arguing that the seizure took place for constitutional purposes when the officers blocked defendant's egress and began to ask him questions.

The State argues that there was sufficient evidence to justify the stop and frisk. The State contends that Officer Goonan had reasonable suspicion to stop defendant, even without evidence that defendant was in a high-crime area. Furthermore, the State argues that even without any direct interaction between

15

defendant and the two unidentified individuals, Officer Goonan's belief that defendant was about to engage in criminal activity suffices to support a finding of reasonable and articulable suspicion in this case. The State again argues that the trial court misapplied the frisk standard in focusing on the threat of a gun rather than whether officers reasonably believed that the individual posed a threat to officer safety.

## IV.

### A.

Our standard of review on a motion to suppress is deferential -- we "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). This Court defers to those findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We ordinarily will not disturb the trial court's factual findings unless they are "so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). A trial court's legal conclusions, however, and its view of "the consequences that flow from

16

established facts" are reviewed de novo.  State v. Hubbard, 222 N.J. 249, 263 (2015).

B.

Under both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid." Elders, 192 N.J. at 246. "People, generally, are free to go on their way without interference from the government.  That is, after all, the essence of the Fourth Amendment -- the police may not randomly stop and detain persons without particularized suspicion." State v. Shaw, 213 N.J. 398, 409-10 (2012) (citing Terry v. Ohio, 392 U.S. 1, 9, 27 (1968)).  Consequently, "the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure '[fell] within one of the few well-delineated exceptions to the warrant requirement.'" Ibid. (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

The exception at issue in this case is an investigative stop, also known as a Terry stop,[5] which is a procedure that involves a relatively brief detention by police during which a person's movement is restricted.  See State v. Rosario, 229 N.J. 263, 272 (2017) (describing an investigative stop as a police

---

[5] Terry, 392 U.S. at 1.

17

encounter during which an objectively reasonable person would not feel free to leave). An investigative stop or detention does not offend the Federal or State Constitution, and no warrant is needed, "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry, 392 U.S. at 21).

Although reasonable suspicion is a less demanding standard than probable cause, "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights." State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part) (quoting State v. Arthur, 149 N.J. 1, 7-8 (1997)); accord State v. Alessi, 240 N.J. 501, 518 (2020). Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of "'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). "An investigative detention that is premised on less than reasonable and articulable suspicion is an 'unlawful seizure,' and evidence discovered

18

during the course of an unconstitutional detention is subject to the exclusionary rule." Elders, 192 N.J. at 247.

The inquiry is based on the totality of the circumstances and takes into consideration numerous factors, including officer experience and knowledge. Pineiro, 181 N.J. at 22. Our jurisprudence is well-settled that seemingly furtive movements by the suspect, without more, are insufficient to constitute reasonable and articulable suspicion. See Rosario, 229 N.J. at 277 ("Nervousness and excited movements are common responses to unanticipated encounters with police officers on the road . . . ."); State v. Lund, 119 N.J. 35, 47 (1990) ("'[M]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity.'" (quoting State v. Schlosser, 774 P.2d 1132, 1137 (Utah 1989))).

With regard to presence in an area where criminal activity is prevalent, although the reputation of an area may be relevant to the analysis, this Court has held that "[j]ust because a location to which police officers are dispatched is a high-crime area does not mean that the residents in that area have lesser constitutional protection from random stops." State v. Chisum, 236 N.J. 530, 549 (2019) (quoting Shaw, 213 N.J. at 420); see Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized

19

suspicion that the person is committing a crime."); see also Pineiro, 181 N.J. at 31 (Albin, J., concurring) ("The words 'high crime area' should not be invoked talismanically by police officers to justify a Terry stop that would not pass constitutional muster in any other location."). In Wardlow, the United States Supreme Court explained that officers need not ignore the relevant characteristics of a neighborhood, but that more is required to find reasonable suspicion. 528 U.S. at 124.

In sum, the totality of the circumstances of the encounter must be considered in a very fact-sensitive analysis to determine whether officers objectively possessed reasonable and articulable suspicion to conduct an investigatory stop. Gamble, 218 N.J. at 431; Pineiro, 181 N.J. at 22.

## V.

Applying those principles to the present case, we find that the information officers possessed at the moment they detained defendant did not constitute reasonable and articulable suspicion that defendant was engaged in unlawful activity.

## A.

As a threshold matter, we must first determine when the investigatory stop commenced. Although officers did not tell defendant to "stop" when he exited the walkway, the two officers blocked his path, and Officer Goonan

acknowledged that defendant could not have moved forward freely at that point. Officer Goonan testified that when defendant "came out of the alleyway, we were two -- two officers standing there." In other words, there was no need for the officers to tell defendant to "stop," because the two officers standing at the end of the walkway sufficiently exerted their authority such that an objectively reasonable person would understand the need to stop and direct attention to the officers. The officers then began asking defendant a series of questions about who he was and where he was coming from.

The trial court held that when the officers asked for defendant's identification, defendant was no longer free to go, and the encounter became an investigatory stop because defendant reasonably believed he could not walk away at that point. But even before asking defendant for identification, armed officers wearing tactical vests with "police" written on the front blocked the walkway as defendant emerged, preventing defendant from making forward progress, and began asking him questions about why he was there and from where he was coming. A reasonable person would not have felt free to leave at that point.

Officer Goonan testified that defendant was free to leave and could have turned around and "run back up that walkway." In reality, had defendant attempted such a maneuver after officers asserted their presence and authority

21

and began asking him questions, such action would likely be viewed as flight. In any event, no reasonably prudent person would have felt free to leave when officers stepped into the only path of egress from that walkway and began asking questions, leaving defendant no place to go but backwards. The moment officers impeded his forward progress and began the questioning, the encounter became an investigatory detention or stop. See Rosario, 229 N.J. at 272. We now turn to whether officers had reasonable and articulable suspicion to stop defendant at that point in time.

B.

Prior to approaching defendant, officers observed two men in front of a vacant house on the 1600 block of Holcaine Street. According to Officer Goonan, those men took off as soon as they saw the officers step out of their unmarked police car wearing tactical vests labeled "police." At the same time, defendant emerged from the walkway. Officer Goonan unequivocally testified that he did not witness defendant interact with or engage in a hand-to-hand transaction with the two men that left the scene.

Notwithstanding that testimony, the trial court upheld the investigative stop's validity, in part, based on its finding that "Officer Goonan knew that defendant had been speaking to two other people after emerging from the walkway," and stated that this "information had significant weight in arousing

22

the officer's suspicion because he was in a high crime neighborhood." The trial court further found that "Officer Goonan observed defendant exit a walkway and approach two individuals" and that the officer "observed the two unidentified individuals <u>with</u> defendant look at him and then walk away." (emphasis added).

Officer Goonan testified, however, that the two men walked away and defendant emerged from the walkway afterwards or simultaneously. No testimony was elicited that defendant interacted or came in contact with the men. Even the State conceded in its brief, and later at oral argument, that "Officer Goonan did not testify that defendant approached or spoke with the individuals in front of the property." In short, the trial court's findings -- to which the court attributed significant weight in its determination that the officers had reasonable and articulable suspicion to stop defendant -- did not accurately reflect the evidence presented by the State through Officer Goonan's testimony. Those findings were not based on credible evidence in the record and are therefore not entitled to deference. Based on the evidence presented, we give no weight, let alone significant weight, to the trial court's finding that defendant interacted with the two individuals.[6]

---

[6] We do not suggest that even if Officer Goonan had seen defendant interact with the two men that such interaction would have tipped the scales toward a finding of reasonable and articulable suspicion of criminal activity. Three

23

As for defendant's presence in a high-crime area, we decline defendant's and amici's request that the Court abandon presence in a high-crime area as a factor in determining whether reasonable and articulable suspicion exists. We continue to view the impact of previous crimes in the same area as a police encounter as a factor to be considered in the totality of the circumstances when determining whether a stop was based on reasonable suspicion.

But, as we have held, just because crime is prevalent in a particular area "does not mean that residents in those areas have lesser constitutional protection from random stops." See Shaw, 213 N.J. at 420. Law-abiding citizens who live and work in high-crime areas undoubtedly want law enforcement to be able to fully execute their duties and protect their communities; at the same time, however, those individuals likely do not want the necessary policing of their neighborhoods to occur at the expense of their own constitutional rights of privacy and freedom. There is, to be sure, a "narrow line that must be drawn to protect a citizen's privacy and freedom of movement and yet allow proper law-enforcement activities." Davis, 104 N.J. at 504-05.

---

people standing on the street interacting with each other, whether in a high-crime neighborhood or not, is not suggestive of criminal activity without more.

The State must do more than simply invoke the buzz words "high-crime area" in a conclusory manner to justify investigative stops. Here, Officer Goonan's vague testimony fell short of providing factual support for his conclusory statement that the area was high crime.

Officer Goonan testified in very general terms that the 1600 block of Holcaine is "a high-crime area." The following is a portion of his testimony on this issue:

> OFFICER GOONAN: 1600 block of Holcaine is the block we were on, and that's a -- it's a high crime area.
>
> PROSECUTOR: Okay. And when you say high crime area, what does that mean?
>
> OFFICER GOONAN: Very well-known for -- for weapons. In the past there's been shootings and it's an open air drug -- drug sale.
>
> . . . .
>
> PROSECUTOR: And you said you worked in [the 1600 block of Holcaine] before?
>
> OFFICER GOONAN: Yes.
>
> PROSECUTOR: Have you arrested fug[i]tives in that area?
>
> OFFICER GOONAN: I have.
>
> PROSECUTOR: And have you seen drug transactions in that area before?
>
> OFFICER GOONAN: I have.

25

PROSECUTOR: Approximately how many?

OFFICER GOONAN: Five to ten.

Officer Goonan's testimony provided nothing more than a general description of a high-crime neighborhood, noting it is well known for weapons, shootings, and drug sales. He noted that he had seen five to ten drug sales on that block, presumably over the course of his 20 years as an officer, but that testimony is unclear because the officer did not provide a timeline or context for the drug sales he had witnessed. Furthermore, Officer Goonan stated that he previously arrested fugitives in that neighborhood, but did not indicate the approximate number of fugitives or a timeline during which those arrests occurred. Again, as our caselaw has held, the character and prevalence of crime in an area -- although insufficient on its own to support particularized suspicion -- can be one factor in determining whether reasonable suspicion existed. The State, however, must provide at least some evidence to support the assertion that a neighborhood should be considered as "high-crime."

In the present case, even if Officer Goonan had provided more information regarding the prevalence of crime in the area, that would have been insufficient to justify the stop because the other factors on which the officers relied were also insufficient -- even when taken together -- to form a

26

reasonable and articulable suspicion that defendant was engaged in criminal activity.

Officer Goonan supported his suspicion of defendant by claiming that defendant was "coming out of a walkway between a vacant property which is known for the sales of [drugs] and weapons" after the two unidentified individuals walked away. Officer Goonan testified that he was suspicious of defendant based on his training and experience that drugs and guns are often stored in walkways, because of general "reports [he had] been having in the area," and because of his belief that criminal activity was taking place at the vacant house.[7] None of those non-specific, non-individualized factors, however, "meet the constitutional threshold of individualized reasonable suspicion" that this particular defendant was engaged in criminal activity. See State v. Nyema, 249 N.J. 509, 532 (2022). Aside from defendant's presence on that walkway, none of those factors are specific to defendant engaging in behavior indicative of criminal activity. The only information the officers

---

[7] Officer Goonan further testified that after officers began questioning defendant, he became nervous, looked up and down the street, started sweating, and his hands began to shake. Having determined that the investigatory stop commenced at the moment the officers blocked defendant's path and began the questioning, the observations of defendant's nervous behavior do not factor into a determination of whether officers possessed reasonable and articulable suspicion before stopping defendant. Conduct exhibited or "[i]nformation acquired after a stop cannot retroactively serve as a basis for the stop." State v. Nyema, 249 N.J. 509, 532 (2022).

27

possessed prior to the stop was information that could be used to justify the stop of virtually anyone, on any day, and at any time, based simply on their presence on that street.

An investigative detention "may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014). Officer Goonan had a hunch that defendant was engaged in criminal activity. That hunch, however, did not amount to objectively reasonable and articulable suspicion for an investigatory stop.

Because we hold that the officers' investigatory detention of defendant was unlawful, we do not reach the issue regarding whether officers had reasonable and articulable suspicion to frisk defendant.

## VI.

For the foregoing reasons, the judgment of the Appellate Division is reversed, and the matter is remanded to the trial court to reinstate the suppression order consistent with this opinion.

CHIEF JUSTICE RABNER; JUSTICE ALBIN; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins.

28

State of New Jersey,

Plaintiff-Respondent,

v.

Nazier D. Goldsmith,

Defendant-Appellant.

JUSTICE SOLOMON, dissenting.

Our jurisprudence recognizes that trial courts have a significant advantage over appellate courts:  the ability to see the witnesses and evidence and get a "'feel' of the case."  State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  Accordingly, we routinely defer to them even when we might have a different view of the facts.

In this matter, the trial court's advantage is especially significant because a key piece of evidence -- evidence I view as critical to the determination of defendant's suppression motion -- was before the trial court but is missing from the record on appeal.  That misstep should serve as a vital reminder of the importance of preserving the record to facilitate proper appellate review.

In this case, the trial court had that evidence before it when it decided the point at which defendant's encounter with the police became an

1

investigative detention.  Accordingly, I would defer to the trial court's conclusion.  Instead, the majority considers its review of a handful of lines from a transcript to be a more accurate interpretation of the record.  Thus, I respectfully dissent.

## I.

I add the following facts, collected from the record of the suppression hearing.  During defense counsel's cross-examination of Officer Goonan, counsel questioned Goonan on the officers' positions during their encounter with defendant in front of 1608 Holcaine Street in Camden.  Holcaine Street is narrow, such that "one car has to be coming one way."  Officer Goonan and his partner parked right in front of 1608 Holcaine.  1608 Holcaine was -- in Goonan's words -- a "vacant" house bounded from behind by other houses.

After establishing that defendant was walking down the "alleyway" or "walkway" next to 1608 Holcaine Street, which had other houses behind it, defense counsel submitted into evidence a photograph of the walkway at 1608 Holcaine that, for reasons unknown to us, was not included in the record on appeal.  Goonan agreed that the photograph was an accurate representation of the layout of 1608 Holcaine and the walkway adjoining it on the day of issue. The trial court admitted the photograph without objection from the State.

2

Goonan explained that he and his partner exited the vehicle and began to approach defendant, although neither told defendant to stop. Then the following exchange occurred:

> DEFENSE COUNSEL: So there was nowhere else he could go but towards you guys at that point.
>
> OFFICER GOONAN: He could run back up that walkway.
>
> DEFENSE COUNSEL: All right. But other than the direction of which he's going you are blocking his way from going any further. Correct? You're right at the alley -- walkway. Correct?
>
> OFFICER GOONAN: We -- out front of the house. He came out of the walkway.
>
> DEFENSE COUNSEL: Right. And you two are right there in front of the house outside of the -- right in front of the walkway. Correct?
>
> OFFICER GOONAN: Yes. See -- you have the picture, Ma'am?
>
> DEFENSE COUNSEL: I can just --
>
> OFFICER GOONAN: The concrete slab that's out front, it's all concrete it's not grass. We were on there that's where we pulled up to. He walked out of that walkway.

Defense counsel then asked Goonan to circle the exact area in which he and his partner were standing and then had Goonan initial the exhibit.

Soon after, the following exchange occurred:

3

DEFENSE COUNSEL: Now you said that when you approached you were within a few feet of Mr. Goldsmith. Correct?

OFFICER GOONAN: Yes.

DEFENSE COUNSEL: You were within an arm's reach of Mr. Goldsmith?

PROSECUTOR: Objection. He never stated that.

DEFENSE COUNSEL: It's a question. He said a few feet, but --

THE COURT: Okay. So you want to know whether -- he's characterizing it as arm's length?

DEFENSE COUNSEL: That's what I'm asking.

THE COURT: Okay.

OFFICER GOONAN: No. It wasn't an arm's length.

DEFENSE COUNSEL: Okay. So can you point to somewhere in the room how far you were from Mr. Goldsmith?

OFFICER GOONAN: Um, maybe that chair.

DEFENSE COUNSEL: Okay. And you're pointing to the second chair away from you. Correct?

OFFICER GOONAN: I am.

DEFENSE COUNSEL: Your Honor, I would like that to reflect two feet, two and a half feet.

PROSECUTOR: I don't -- I object to that characterization.

4

THE COURT: I mean, I can't -- I can't characterize -- I can't accept, without testimony from him, how far it is, other than to say that it wasn't arm's length and it's two chairs.

DEFENSE COUNSEL: Okay. Based on the jury box, you want me to get a measuring tape, your Honor?

THE COURT: Yeah. I mean, you could give him a measuring tape, ask him to measure it and ask him --

DEFENSE COUNSEL: Okay.

THE COURT: -- what the distance is.

DEFENSE COUNSEL: All right, Judge. I don't have one on me.

THE COURT: Okay.

DEFENSE COUNSEL: I don't know if there's one here, but, all right.

THE COURT: I see that it's two chair lengths away.

DEFENSE COUNSEL: Okay.

## II.

At the outset, I note that our standard of review is a deferential one. An appellate court "should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 161). That "feel"

5

of the case is why "[a]n appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." Ibid. (quoting Johnson, 42 N.J. at 162)). Regarding suppression motions, we have stated:

> Our system of justice assigns to the trial court the role of factfinder in matters not relegated to the jury. Trial judges in our Criminal Part routinely hear and decide suppression motions in which defendants seek to exclude evidence based on alleged violations of the Fourth and Fifth Amendments of the United States Constitution and corollary provisions of our State Constitution and common law. Our trial judges have ongoing experience and expertise in fulfilling the role of factfinder.
>
> [State v. S.S., 229 N.J. 360, 380 (2017).]

Thus in S.S. we concluded our standard of review is deferential when a trial court makes "fact findings based solely on video or documentary evidence." Id. at 379; see also Elders, 192 N.J. at 244-45.

Accordingly, "[a] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.' In those circumstances solely should an appellate court 'appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.'" Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 162).

6

III.

A.

I agree with the majority that the threshold question in this appeal turns on the exact moment the officers initiated a Terry[1] stop. I also agree that the appropriate standard for that inquiry is whether "'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" State v. Chisum, 236 N.J. 530, 545 (2019) (quoting State v. Rosario, 229 N.J. 263, 272 (2017)). "The encounter is measured from a defendant's perspective." Rosario, 229 N.J. at 273.

Our case law recognizes that when a police officer blocks an individual's path, the officer has placed that individual under investigative detention, or a Terry stop, because an individual in such circumstances would not feel free to leave. See, e.g., id. at 276; State v. Tucker, 136 N.J. 158, 166 (1994). But determining exactly when a police officer has "blocked" an individual's path -- thereby beginning a Terry stop -- is a fact-sensitive inquiry that depends on many factors, including the distance between the officers and the individual, their relative positioning, the officers' demeanor and use or nonuse of weapons, and the general circumstances and environment

___

[1] Terry v. Ohio, 392 U.S. 1 (1968).

surrounding the encounter.  See, e.g., Rosario, 229 N.J. at 273-74; United States v. De Castro, 905 F.3d 676, 679 (3d Cir. 2018); United States v. Cloud, 994 F.3d 233, 242 (4th Cir. 2021); State v. Lewis, 217 A.3d 576, 588 (Conn. 2019); Bailey v. State, 987 A.2d 72, 82 (Md. 2010).  None of these factors are determinative.  Instead, we consider the totality of the circumstances.  See Rosario, 229 N.J. at 273.

Here, the trial court did not come to an explicit finding that the officers blocked defendant's path.  Nor did the court find that the officers brandished or drew their weapons or acted in way that was disrespectful to defendant prior to asking him for identification.  That moment, in the trial court's view, was the moment the seizure began.

The majority concludes that the trial judge's finding that defendant had interacted with the two other individuals is not supported by the record and that Goonan's nonspecific testimony about the area of the encounter is insufficient to support a finding that defendant was in a high-crime area.  See ante at ___ (slip op. at 23-27).  I agree.  But those facts have little relevance to when the investigative stop began.  The most important facts to that determination are the exact locations of the officers, of defendant, the distance between them, and the surrounding environment.  See Rosario, 229 N.J. at 273-74.  The trial court concluded that the Terry stop began when the officers

8

asked for defendant's identification -- an act that we have previously held is consistent with an investigative detention. See id. at 273 ("Here, the officer immediately asked for defendant's identification. Although not determinative, that fact only reinforces that this was an investigative detention.").

Yet the majority asserts that "[g]iven where the officers were standing in front of the walkway, they blocked defendant's path forward. According to Officer Goonan, defendant could not have moved forward freely, but 'could run back up that walkway,' essentially away from the officers," which would likely be considered flight. Ante at ___ (slip op. at 9). The majority later claims that "Officer Goonan acknowledged that defendant could not have moved forward freely at that point. Officer Goonan testified that when defendant 'came out of the alleyway, we were two -- two officers standing there.'" Ante at ___ (slip op. at 20-21). Thus, in the majority's view, "the two officers standing at the end of the walkway sufficiently exerted their authority such that an objectively reasonable person would understand the need to stop and direct attention to the officers." Ante at ___ (slip op. at 21).

The record does not support the majority's conclusion. Goonan's suggestion that defendant could have run back up the walkway and his statement that he was standing there when defendant came out the alleyway do not lead to the conclusion that defendant could not move forward freely or that

9

the officer was blocking defendant from leaving the area. Those statements do little to explain Goonan's exact location, defendant's exact location, their relative positions, or the general geography of the encounter, a problem we have long confronted in our function as an appellate tribunal reviewing a record consisting solely of transcripts. See S.S., 229 N.J. at 374-81; Elders, 192 N.J. 243-44.

Perhaps cognizant that Goonan's confusing testimony might frustrate future appellate review, defense counsel attempted to clarify the officers' position using a photograph of 1608 Holcaine. She suggested in a question that the officers "were blocking [defendant's] way from going any further" and Goonan responded that he and his partner "were out front of the house." That answer suggests that the officers were not in defendant's path but in front of the house that adjoins the walkway. He then marks his exact location on the photograph, which was in evidence at the time.

Responding to further questioning, Goonan denied being within arm's reach of defendant. From the discussion following that question, we know that the distance between defendant and the officers was somewhere between an arm's length and "two chair lengths," a distance that likely varies by the courtroom, and by the chair.

10

From the above, it cannot be ascertained that the officers blocked the defendant's escape. Even assuming that they did, it cannot be determined at what point in time they began to do so.

From those vague facts, the majority believes it understands this encounter better than the trial judge who saw (1) an accurate representation of the layout of 1608 Holcaine and possibly the properties immediately surrounding it; (2) Goonan's recollection of the exact location of the officers marked on that photograph; and (3) Goonan's recollection of the exact distance between himself and defendant demonstrated in the courtroom. "Permitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" S.S., 229 N.J. at 380-81 (alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment).

A fact-sensitive inquiry does not entail ignoring facts before the trial court, even when they are not readily apparent from the record on appeal. That is the very essence of the "feel of the case."

B.

We have long acknowledged that law enforcement officers face substantial, sometimes lethal, danger. See, e.g., State in Int. of H.B., 75 N.J. 243, 246 (1977) ("This volatile mixture, of violence and the surfeit of handguns . . . , presents . . . a particular threat to the uniformed law enforcement community . . . which cannot be ignored in considering the constitutionality of the police conduct here involved."); Terry v. Ohio, 392 U.S. 1, 24 (1968) ("[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."); State v. Valentine, 134 N.J. 536, 545 (1994) ("As the front line against violence, law-enforcement officers are particularly vulnerable to violence often becoming its victims."); State v. Radel, 249 N.J. 469, 505-06 (2022) (describing situation officers faced as "dynamic and uncertain" and how the officers in that case "faced unexpected and fast-evolving circumstances that signaled danger and the need for prompt action to safeguard their lives").

Such dangers continue to face law enforcement today. See Press Release, Federal Bureau of Investigation, FBI Releases 2021 Statistics on Law Enforcement Officers Killed in the Line of Duty (May 9, 2022) (noting that 73

12

officers were feloniously killed in the United States in 2021, an increase from 46 in 2020).

Small distances -- like small measures of time -- can be of great constitutional significance in assessing police-citizen encounters. See Radel, 249 N.J. at 506; State v. Bard, 445 N.J. Super. 145, 158-59 (App. Div. 2016). Thus, there are consequences attached to the way we, as appellate judges, assess the facts. Keeping that in mind, we have held that "[t]he reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make split second decisions in a fluid situation." Bard, 445 N.J. Super. at 157. In "those more murky and difficult situations . . . law-enforcement officers must make instantaneous decisions about whether a frisk," a stop, or some other act is justifiable. Valentine, 134 N.J. at 545. Such encounters are not the most amenable to appellate review of cold, paper records.

## C.

It is unfortunate that we do not have the photograph before us, but we have long acknowledged that we, as appellate judges, will not have the perspective the trial court did. Based on that perspective, the trial court below did not find that the officers blocked defendant's path such that a reasonable person would not feel free to leave. Yet the majority finds that the officers

blocked the defendant's path based on even less evidence than the trial court had.

This sparse and vague record does not support the majority's conclusion that the officers blocked defendant's "only path of egress from that walkway and began asking questions, leaving defendant no place to go but backwards." Ante at ___ (slip op. at 22).

"A disagreement with how the motion judge weighed the evidence in a close case is not a sufficient basis for an appellate court to substitute its own factual findings to decide the matter." Elders, 192 N.J. at 245. The trial court here was not "so clearly mistaken 'that the interests of justice demand [our] intervention and correction.'" Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 161). Rather than follow longstanding principles of appellate review, the majority here, once again, decides that it understands the facts better than the factfinder.

Accordingly, I dissent. Because the majority does not address the frisk, or whether it was justified by reasonable and articulable suspicion at that moment, I do not either.